1    RICHARD B. GOETZ (S.B. #115666)
     DIANA M. TORRES (S.B. #162284)
2    CARLOS M. LAZATIN (S.B. #229650)
     O'MELVENY & MYERS LLP
3    400 South Hope Street
     Los Angeles, CA  90071-2899
4    Telephone:  (213) 430-6000
     Facsimile:   (213) 430-6407
5    rgoetz@omm.com
     dtorres@omm.com
6    clazatin@omm.com

7    STEVEN A. ZALESIN (admitted *pro hac vice*)
     CLAY J. PIERCE (admitted *pro hac vice*)
8    KARLA G. SANCHEZ (admitted *pro hac vice*)
     PATTERSON BELKNAP WEBB & TYLER LLP
9    1133 Avenue of the Americas
     New York, New York 10036-6710
10   Telephone:  (212) 336-2000
     Facsimile:   (212) 336-2222
11   sazalesin@pbwt.com
     cjpierce@pbwt.com
12   kgsanchez@pbwt.com

13
     *Attorneys for Defendants McNeil-PPC, Inc. and*
14   *McNeil Nutritionals, LLC*

15                  **UNITED STATES DISTRICT COURT**

16                  **CENTRAL DISTRICT OF CALIFORNIA**

17

18
     THE SUGAR ASSOCIATION,                  Case No.  CV 04-10077 DSF (RZX)
19   INC., a Delaware corporation,
                                             **MCNEIL'S MEMORANDUM OF**
20                    Plaintiff,             **CONTENTIONS OF FACTS AND LAW**
                                             **[CORRECTED VERSION]**
21            v.

22   McNEIL-PPC, INC., a New Jersey          Complaint Filed:    Dec. 10, 2004
     corporation, McNEIL
23   NUTRITIONALS, LLC, a Delaware           Pretrial Conf:      January 7, 2008
     Limited Liability Company, and          Trial Date:         January 29, 2008
24   DOES 1 through 10,
                                             Place:  Courtroom 840
25                    Defendants.            Judge:  Honorable Dale S. Fischer

26
     AND RELATED ACTIONS
27

28

Table of Contents

Page

I.   INTRODUCTION .................................................................................2

II.  PLAINTIFFS' CLAIM AND MCNEIL'S AFFIRMATIVE DEFENSES ......3

   A.   Plaintiffs' Claim ...........................................................................3

   B.   McNeil's Affirmative Defenses ..............................................................4

   C.   Key Evidence in Opposition to Plaintiffs' Claim and In Support of
      McNeil's Affirmative Defenses ...............................................................4

      1.   Splenda is "Made From Sugar" ...................................................5

      2.   Splenda "Tastes Like Sugar" Because It Is "Made From Sugar" 7

      3.   Consumers Are Not Misled by Splenda Advertising...................8

      4.   McNeil Did Not Intend to Deceive Consumers.........................11

      5.   Interstate Commerce ...................................................................14

      6.   Mistaken Beliefs Are Not Material to Consumers' Decisions to
         Purchase Splenda .......................................................................14

      7.   Plaintiffs Have Not Been Injured as a Result of Any Alleged
         Deception ...................................................................................14

      8.   Plaintiffs' Claims Are Barred By Laches ...................................16

      9.   Plaintiffs' Hands are "Unclean"..................................................19

III. MCNEIL'S COUNTERCLAIM AND COUNTERCLAIM-DEFENDANTS'
   AFFIRMATIVE DEFENSES........................................................................20

   A.   McNeil's Counterclaims...........................................................................20

   B.   Counterclaim Defendants' Affirmative Defenses...............................23

   C.   Key Evidence in Support of McNeil's Counterclaims and In
      Opposition to Counterclaim Defendants' Affirmative Defenses.........25

      1.   False or Misleading Statements of Fact About Splenda in
         Advertising..................................................................................25

      2.   The Unblemished Safety Record of Splenda..............................26

Table of Contents (continued)

Page

a.    The "Truth About Splenda" Campaign ............................28

3.    The Advertisements Actually Deceived a Substantial Segment

of Their Audience. ....................................................33

4.    The Counterclaim Defendants' Deception was Material...........35

5.    Interstate Commerce ................................................36

6.    McNeil Has Been and Is Likely to be Injured as a Result of the

False Advertising .......................................................36

7.    Plaintiffs' Ad Campaign Against Splenda Was Not Incidental to

a Bona Fide Effort to Petition the Government .........................37

8.    Suggestions to "Send a Letter to the FDA" on Plaintiffs'

Website Are Not Bona Fide Petitioning but Merely a Sham.....38

9.    McNeil's Alleged Unclean Hands .............................................41

10.   McNeil's Alleged Waiver ..........................................................41

IV.   CONTENTIONS OF LAW .........................................................42

A.    Issues to Be Resolved by the Court and the Jury .................42

1.    McNeil's affirmative defense of laches. ....................................42

2.    McNeil's and Counterclaim Defendants' affirmative defenses of

unclean hands. ...........................................................43

1.    Injunction ..........................................................................44

2.    Attorneys' Fees and Enhanced Damages..................................44

3.    Disgorgement/Accounting of Profits ........................................44

3.    McNeil's claims under the California Business and Professions

Code ...................................................................45

B.    Key Legal Issues Germane to the Case ................................45

1.    Equitable Defenses.................................................................45

a.    Laches ..............................................................................45

b.    Unclean Hands................................................................50

4.    Noerr-Pennington Defense..........................................................54

Table of Contents (continued)

Page

1    a.    Legal Standard to Determine Whether Counterclaim
2          Defendants are Engaged in Bona Fide Petitioning..........55
3    b.    Even If Noerr Were Applicable, the Sham Exception
4          Precludes Counterclaim Defendants From Escaping
5          Liability...........................................................................57
6    c.    The Website Is Not "Attendant Publicity" for this
7          Lawsuit..........................................................................58
8    5.   Damages.....................................................................................58
9    a.    Disgorgement.................................................................58
10   b.    Corrective Advertising...................................................61
11  V.    EVIDENTIARY ISSUES...................................................................64
12  VI.   ABANDONMENT OF ISSUES..........................................................65
13  VII.  ATTORNEYS' FEES..........................................................................65
14  VIII. BIFURCATION..................................................................................66

15
16
17
18
19
20
21
22
23
24
25
26
27
28

Table of Authorities

Page

**FEDERAL CASES**

*Adray v. Adray-Mart, Inc.*,
76 F.3d 984 (9th Cir. 1995) ................................................................ 61, 62, 63

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. *492 (1988)* ............................................................................... *passim*

*Burndy*,
584 F. Supp. 656 (D. Conn. 1984),
aff'd, 748 F.2d 767 (2d Cir. 1984) .............................................................. 59, 60

*Cairns v. Franklin Mint Co.*,
24 F. Supp.2d 1013 (C.D. Cal. 1998) ......................................................... 3, 5, 20

*California v. America Stores Co.*,
495 U.S. 271 (1990)............................................................................................ 43

*Castrol, Inc. v. Pennzoil Quaker State Co.*,
169 F. Supp.2d 332 (D.N.J. 2001) .................................................................... 45

*Cayuga Indian Nation v. Pataki*,
79 F. Supp.2d 78 (N.D.N.Y. 1999)..................................................................... 43

*Central Hudson Gas & Electric Corp. v. Public Serv. Commission*,
447 U.S. 557 (1980)............................................................................................ 56

*Century 21 Real Estate Corp. v. Sandlin*,
846 F.2d 1175 (9th Cir. 1988) .......................................................................... 58

*In re Century 21-Remax Real Estate Adver. Claims Litigation*,
882 F. Supp. 915 (C.D. Cal. 1994) ............................................................ *passim*

*Cher v. Forum International, Ltd.*,
213 U.S.P.Q. 96 (C.D. Cal. 1982) .................................................................... 62

*Chiron Corp. v. Genentech, Inc.*,
268 F. Supp.2d 1139 (E.D. Cal. 2002) ............................................................. 48

*Citizens Finance Group v. Citizens National Bank*,
383 F.3d 110 (3d Cir. 2004).................................................................... 4, 24, 51

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*,
526 U.S. 687 (1999)............................................................................................ 44

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982) .......................................................................... 24

*Compaq Computer Corp. v. Ergonome, Inc.*,
196 F. Supp.2d 471 (S.D. Tex. 2002)................................................................ 43

*Conopco, Inc. v. Campbell Soup Co.*,
95 F.3d 187 (2d Cir. 1996)................................................................................. 48

Table of Authorities (continued)

Page

*Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*,
   911 F.2d 242 (9th Cir. 1990) ................................................. 3, 20, 25

*Czaplicki v. The Hoegh Silvercloud*,
   351 U.S. 525 (1956).............................................................. 42

*Daghlian v. DeVry University, Inc.*,
   461 F. Supp.2d 1121 (C.D. Cal. 2006) ................................. 21, 23

*Danjaq LLC v. Sony Corp.*,
   263 F.3d 942 (9th Cir. 2001) ............................................ *passim*

*Dollar System, Inc. v. Avcar Leasing System, Inc.*,
   890 F.2d 165 (9th Cir. 1989) ................................. 4, 24, 42, 50, 52

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)............................................................... 24

*Faberge, Inc. v. Saxony Products, Inc.*,
   605 F.2d 426 (9th Cir. 1979) .................................................. 61

*First Act Inc. v. Brook Mays Music Co.*,
   429 F. Supp.2d 429 (D. Mass. 2006)....................................... 62

*First Health Group Corp. v. BCE Emergis Corp.*,
   269 F.3d 800 (7th Cir. 2001) ................................................... 9

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) .................................................... 23

*Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*,
   826 F.2d 837 (9th Cir. 1987) ..................................... 4, 24, 50

*Gidatex, S.r.L. v. Campaniello Importations, Ltd.*,
   82 F. Supp.2d 126 (S.D.N.Y. 1999) ........................................ 43

*Granite State Insurance Co. v. Smart Modular Technologies, Inc.*,
   76 F.3d 1023 (9th Cir. 1996) ............................................ 42, 43

*Grupo Gigante SA de CV v. Dallo & Co., Inc.*,
   391 F.3d 1088 (9th Cir. 2004) ................................................ 46

*Hanover Star Milling Co. v. Metcalf*,
   240 U.S. 403 (1916)............................................................... 49

*Harper House, Inc. v. Thomas Nelson, Inc.*,
   889 F.2d 197 (9th Cir. 1989) .................................................. 60

*Heary Brothers Lightning Protection Co. v. Lightning Protection Institute*,
   287 F. Supp.2d 1038 (D. Ariz. 2003) ....................................... 9

*Heighley v. J.C. Penney Life Insurance Co.*,
   257 F. Supp.2d 1241 (C.D. Cal. 2003)..................................... 23

**MCNEIL MEMO OF FACT AND LAW**
CV 04-10077 DSF (RZX)

Table of Authorities (continued)

Page

*Highway Cruisers of Cal., Inc. v. Security Industrial, Inc.,*
374 F.2d 875 (9th Cir. 1967) ............................................................... 61

*Hot Wax v. Turtle Wax,*
191 F.3d 813 (7th Cir. 1999) ................................................... 13, 46, 47, 49, 51,

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
304 F.3d 829 (9th Cir. 2002) ........................................................ *passim*

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms.,*
19 F.3d 125 (3d Cir. 1994)............................................... 11, 33, 49, 51

*Kelley Blue Book v. Car-Smarts, Inc.,*
802 F. Supp. 278 (C.D. Cal. 1992) ...................................................... 53

*Kottle v. Northwest Kidney Centers,*
146 F.3d 1056 (9th Cir. 1998) ..................................................... 24, 57

*Lindy Pen Co. v. Bic Pen Corp.,*
982 F.2d 1400 (9th Cir. 1993) ................................................. 59, 60, 63

*Lippitt v. Raymond James Finance Services, Inc.,*
340 F.3d 1033 (9th Cir. 2003) ........................................................... 23

*Lozano v. AT & T Wireless Services, Inc.,*
504 F.3d 718 (9th Cir. 2007) .......................................................... 3, 20

*Maier Brewing Co. v. Fleischmann Distilling Corp.,*
390 F.2d 117 (9th Cir. 1968) ............................................................. 59

*Mardirosian v. Lincoln National Life Insurance Co.,*
739 F.2d 474 (9th Cir.1984) .............................................................. 25

*McCune v. F. Alioto Fish Co.,*
597 F.2d 1244 (9th Cir. 1979) ........................................................... 46

*McDougal-Wilson v. Goodyear Tire & Rubber Co.,*
427 F. Supp.2d 595 (E.D.N.C. 2006) ................................................. 43

*McKennon v. Nashville Banner Public Co.,*
513 U.S. 352 (1995)........................................................................... 43

*Mile High Industrial v. Cohen,*
222 F.3d 845 (10th Cir. 2000) ........................................................... 43

*Miller v. Glenn Miller Products,*
318 F. Supp.2d 923 (C.D. Cal. 2004),
*aff'd and adopted, Miller,* 454 F.3d 975 (9th Cir. 2006) ................... 45

*Mutual Pharm. Co v. Ivax Pharms., Inc.,*
459 F. Supp.2d 925 (C.D. Cal 2006) ...................................................8

*Nartron Corp. v. STMicroelectronics, Inc.,*
305 F.3d 397 (6th Cir. 2002) ............................................................. 48

**MCNEIL MEMO OF FACT AND LAW**
CV 04-10077 DSF (RZX)

Table of Authorities (continued)

Page

*Novartis Consumer Health, Inc.  v. Johnson & Johnson-Merck Consumer Pharms. Co.,*
290 F.3d 578 (3d Cir. 2002)...................................................... 25, 26

*Okura & Co. (America), Inc. v. Careau Group,*
783 F. Supp. 482 (C.D. Cal. 1991) ..................................................... 45

*U.S. on Behalf and for the Benefit of Army Athletic Association v. Reliance Insurance Co.,*
799 F.2d 1382 (9th Cir. 1986) ..................................................... 25

*PBM Prod., Inc. v. Mead Johnson & Co.,*
174 F. Supp.2d 417 (E.D.Va. 2001) ..................................................... 62

*Pfizer, Inc. v. International Rectifier Corp.,*
685 F.2d 357 (9th Cir. 1982) ..................................................... 51

*Pioneer Hi-Bred International, Inc. v. Ottawa Plant Food, Inc.,*
219 F.R.D. 135 (N.D. Iowa 2003) ..................................................... 43

*Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.,*
692 F.2d 1272 (9th Cir. 1982) ..................................................... 44, 59, 61

*Porous Media Corp. v. Pall Corp.,*
173 F.3d 1109 (8th Cir. 1999) ..................................................... 56

*Professional Real Estate Investors v. Columbia Pictures Industrial,*
508 U.S. 49 (1993)..................................................... 39, 58

*Prudential Insurance Co. v. Gibraltar Finance Corp.,*
694 F.2d 1150 (9th Cir. 1982) ..................................................... 47

*Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,*
970 F.2d 552 (9th Cir. 1992) ..................................................... 44

*Republic Molding Corp. v. B.W. Photo Utility,*
319 F.2d 347 (9th Cir. 1963) ..................................................... 52, 53

*Rice v. Fox Broad. Co.,*
330 F.3d 1170 (9th Cir. 2003) ..................................................... 3, 20, 35

*Rivera v. Nibco, Inc.,*
364 F.3d 1057 (9th Cir. 2004) ..................................................... 43

*Schering Corp. v. Amgen Inc.,*
969 F. Supp. 258 (D. Del. 1997)..................................................... 43

*Skippy, Inc. v. CPC International, Inc.,*
674 F.2d 209 (4th Cir. 1982) ..................................................... 49

*Sosa v. DirecTV, Inc.,*
437 F.3d 923 (9th Cir. 2006) ..................................................... 24, 38, 57

**MCNEIL MEMO OF FACT AND LAW**
CV 04-10077 DSF (RZX)

Table of Authorities (continued)

Page

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) .................................................. 9, 20, 25, 26, 33, 57

*Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association*,
  311 F. Supp.2d 1023 (D. Or. 2004),
  *aff'd*, 465 F.3d 1102 (9th Cir. 2006) ........................................................ 45, 47

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007)................................................................... 25

*U-Haul International, Inc. v. Jartran, Inc.*,
  793 F.2d 1034 (9th Cir. 1986) .......................................................... 59, 62

*Van Ness Townhouses v. Man Industrial Corp.*,
  862 F.2d 754 (9th Cir. 1988) .............................................................. 25

*Washington Capital Basketball Club v. Barry*,
  419 F.2d 472 (9th Cir. 1969) ......................................................... 52, 54

*Watson Laboratoriess, Inc. v. Rhone-Poulenc Rorer, Inc.*,
  178 F. Supp.2d 1099 (C.D. Cal. 2001) .................................................. 23

*William H. Morris Co. v. Group W, Inc.*,
  66 F.3d 255 (9th Cir. 1995) ....................................................... 8, 26, 33

**STATE CASES**

*Beasley v. Wells Fargo Bank*,
  235 Cal. App.3d 1407 (Cal. App. 4 Dist. 1991) .................................. 65

*Californians for Population Stabilization v. Hewlett-Packard Co.*,
  58 Cal. App.4th 273 (Cal. App. 6 Dist. 1997).................................... 65

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Telegraph Co.*,
  973 P.2d 527 (Cal. 1999)..................................................................... 23

*Colgan v. Leatherman Tool Group, Inc.*,
  135 Cal. App.4th 663 (2006) ............................................................... 21

*Committee on Children's Television, Inc. v. General Foods Corp.*,
  673 P.2d 660 (Cal. 1983)...................................................................... 23

*Cortez v. Purolater Air Filtration Products Co.*,
  23 Cal.4th 163 (2000) ................................................................ 25, 42, 54

*Dole v. Bakersfield Inc. v. Workers' Comp. Appeals Board*,
  64 Cal. App.4th 1273 (1998) ............................................................... 25

*Farmers Insurance Exch.*,
  2 Cal.4th 377 (1992) ............................................................................. 23

*Hodge v. Superior Court*,
  145 Cal. App. 4 51 Cal. Rptr. 3d 519 (Cal. App. 2 Dist. 2006) ........ 45

Table of Authorities (continued)

Page

*Kasky v. Nike, Inc.,*
27 Cal.4th 939 (2002) ................................................................. 21

**DOCKETED CASES**

*Oyster Software, Inc. v. Forms Processing, Inc.,*
No. C-00-0724, 2001 WL 1736382 (N.D. Cal. Dec. 6, 2001) ......................... 44

*Procter & Gamble Pharms., Inc. v. Hoffmann-La Roche, Inc.,* No. 06 Civ.
0034, 2006 WL 2588002 (S.D.N.Y. Sept. 6, 2006) ........................................... 51

**FEDERAL STATUTES**

15 U.S.C. § 1117 ................................................................. *passim*

15 U.S.C. § 1125 ................................................................. *passim*

**STATE STATUTES**

Cal. Bus. & Prof. Code §§17500, 17200 ........................................................ *passim*

LA2:851172.1

**MCNEIL MEMO OF FACT AND LAW**
CV 04-10077 DSF (RZX)

I.    **INTRODUCTION**

Plaintiff The Sugar Association, Inc. (the "Sugar Association") and plaintiff-interveners American Sugar Refining, Imperial Sugar Company, Rio Grande Valley Sugar Growers, Western Sugar Cooperative, and C&H Sugar Company (collectively with the Sugar Association, "plaintiffs") allege that Defendants McNeil Nutritionals, LLC and McNeil-PPC, Inc. ("McNeil") have made false and misleading statements in advertisements for Splenda® No Calorie Sweetener in violation of the Lanham Act, 15 U.S.C. § 1125.  According to plaintiffs, the Splenda slogans "made from sugar so it tastes like sugar" and "made from sugar, tastes like sugar" are literally false and, in context, convey the false message that Splenda actually "contains sugar," "is natural," "is safe" and "is as safe as sugar."

McNeil denies these allegations in all respects and asserts that plaintiffs' claims are barred by plaintiffs' unreasonable and prejudicial delay in bringing suit (*i.e.*, laches) and barred by their inequitable conduct in waging a far-reaching deceptive public relations and advertising campaign – paradoxically named "The Truth About Splenda" – designed to create unfounded fears about the safety of McNeil's product (*i.e.*, unclean hands).

McNeil further asserts counterclaims against the Sugar Association, American Sugar Refining, Inc., Imperial Sugar Company, Rio Grande Valley Sugar Growers, Inc. and their public relations firm Qorvis Communications, LLC (collectively "counterclaim defendants") alleging that counterclaim defendants' "The Truth About Splenda" campaign is replete with claims that disparage Splenda and McNeil and convey the false message that Splenda is unsafe in violation of the Lanham Act and California state laws barring unfair competition, product disparagement/trade libel and false advertising.

Counterclaim defendants, in defense, assert the defenses of unclean hands and waiver and argue that they have a First Amendment right to tarnish

- 2 -

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

Splenda and its safety in the public's mind.  All of counterclaim defendants'
asserted defenses are legally and factually deficient.

## II.   PLAINTIFFS' CLAIM AND MCNEIL'S AFFIRMATIVE DEFENSES

### A.   Plaintiffs' Claim

**Claim 1:**   **McNeil's "made from sugar so it tastes like sugar" and "made from sugar, tastes like sugar" claims in Splenda advertising are false or misleading in violation of the Lanham Act, 15 U.S.C. § 1125.**

      i)    In advertisements for Splenda, McNeil made false or misleading statements of fact about its product or another's.

      ii)    Those advertisements actually deceived a substantial segment of their audience.

      iii)    Such deception is material, in that it is likely to influence the purchasing decision of consumers.

      iv)    McNeil made its statements in interstate commerce or in such a way as to have an impact on interstate commerce.

      v)    Plaintiffs have been or are likely to be injured as a result of the false or misleading statements.

      *See Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718, 731 (9th Cir. 2007); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir. 1990); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1036 (C.D. Cal. 1998); *In*

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1          *re Century 21-Remax Real Estate Adver. Claims Litig.*,

2          882 F. Supp. 915, 922 (C.D. Cal. 1994).

3      **B.      McNeil's Affirmative Defenses**

4  **Defense 1:  Plaintiffs' claim is barred, in whole or in part, by laches.**

5              i)      Plaintiffs delayed unreasonably in filing suit.

6              ii)     McNeil has been prejudiced as a result of plaintiffs' delay.

7                      *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829,

8                      835 (9th Cir. 2002); *Danjaq LLC v. Sony Corp.*, 263 F.3d 942,

9                      952-55 (9th Cir. 2001); *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191

10                     F.3d 813, 820 (7th Cir. 1999).

11  **Defense 2:  Plaintiffs' claim is barred by unclean hands.**

12             i)      Plaintiffs have acted inequitably through fraudulent conduct of

13                     an egregious nature.

14             ii)     Plaintiffs' inequitable conduct directly relates to the subject

15                     matter of their claim.

16                     *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829,

17                     841-42 (9th Cir. 2002); *Dollar Sys., Inc. v. Avcar Leasing Sys.,*

18                     *Inc.*, 890 F.2d 165, 173 (9th Cir. 1989); *Fuddruckers, Inc. v.*

19                     *Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987);

20                     *Citizens Fin. Group v. Citizens Nat'l Bank*, 383 F.3d 110, 129

21                     (3d Cir. 2004).

22     **C.      Key Evidence in Opposition to Plaintiffs' Claim and In**

23             **Support of McNeil's Affirmative Defenses**

24             McNeil markets Splenda, the ubiquitous sugar substitute in yellow

25  packaging that is available in grocery stores, coffee bars and restaurants throughout

26  the nation.  Launched nationwide in September 2000, Splenda was the first

27  sweetener to be marketed in the United States that contains sucralose, a

28  revolutionary ingredient made through a process that takes sucrose and modifies it

- 4 -

1  in such a way as to preserve its taste and functionality, but eliminate its calories.

2  Splenda has been a noteworthy commercial success and is now the leading artificial

3  sweetener in the United States.

4        The ascent of Splenda has been fueled in part by a high-profile

5  marketing campaign that has supported the product since its launch.  To date,

6  McNeil has spent more than a quarter-billion dollars to promote Splenda to

7  consumers, with the centerpiece of this campaign being the advertising claims that

8  Splenda is "made from sugar, tastes like sugar" and "made from sugar so it tastes

9  like sugar."  Beginning with the product's launch, these claims have appeared on

10  the Splenda box, on essentially all of the more than 40 billion packets of Splenda

11  sold, and in nearly every advertisement for Splenda.  Because these claims are

12  unambiguous and true, plaintiffs' claims must fail.  *See Cairns v. Franklin Mint*

13  *Co.*, 107 F. Supp. 2d 1212, 1223 (C.D. Cal. 2000) (rejecting Lanham Act claim

14  because advertised facts were "literally true").

15        **1.    Splenda is "Made From Sugar"**

16        The sweetening ingredient in Splenda, sucralose, is manufactured

17  through a process that begins with sucrose – that is, sugar – and replaces three of

18  eight hydrogen-oxygen groups on the sugar molecule with three chlorine atoms.

19  The resulting molecular structure of sucralose, unlike any of the other leading

20  artificial sweeteners (including aspartame, saccharine, and ace-K), closely

21  resembles that of sugar[1]:

22

23

24

25

26

---

27  [1] Plaintiffs refer to sucralose by its full chemical formula.  Of course, sucrose also has an
   official chemical formula that is just as intimidating as that of sucralose:  2-[3,4-
28  dihydroxy-2,5-bis (hydroxymethyl)tetrahydrofuran-2-yl]oxy-6-
   (hydroxymethyl)tetrahydropyran-3,4,5-triol.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

Sucrose (C$_{12}$H$_{22}$O$_{11}$)   Sucralose (C$_{12}$H$_{19}$Cl$_3$O$_8$)

But sucralose differs from sucrose in one important way: unlike sugar, sucralose is not metabolized by the body for energy, so it has no calories. All of the sucralose that McNeil has marketed and distributed in the United States has been manufactured starting with real, natural sugar. Thus, as a factual matter, Splenda is, and always has been, literally "made from sugar."

Plaintiffs contend that it is false to advertise Splenda No Calorie Sweetener as "made from sugar" because it contains the bulking agents dextrose and maltodextrin in addition to sucralose. Consumers, however, purchase Splenda for its sweetening ingredient sucralose, and not the bulking agents that simply add to its volume. Indeed, advertising Splenda based upon its "active" ingredient is entirely consistent with standard practice in the consumer products industry. For example, Domino® Confectioners Sugar is promoted as "Powdered Pure Cane Sugar" even though it also contains cornstarch. Consumer products, like Splenda, are advertised on the basis of the ingredient that consumers care about, not the added ingredients that merely add to their volume. That in no way renders their advertising false.[2]

---

[2] The presence of bulking agents in Splenda does not affect its safety. Maltodextrin and dextrose, food additives found in thousands of food products, are generally recognized as safe (GRAS) under applicable FDA regulations. As a result, sucralose – the only novel ingredient in Splenda – was the only ingredient that required FDA approval as "safe" before Splenda could be marketed, and it was so approved in 1998. Plaintiffs have no evidence that maltodextrin and dextrose, alone or in combination with sucralose, are unsafe. At best, Plaintiffs' experts would testify that their rat study allows them to hypothesize that the combination of sucralose and bulking agents may have a different effect on weight gain compared to sucralose alone, but they admit the hypothesis has never been tested.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1
2

### 2.   Splenda "Tastes Like Sugar" Because It Is "Made From Sugar"

3    Splenda also "tastes like sugar." Studies among expert taste testers
4 and average consumers have shown that the taste of sucralose closely approximates
5 that of sugar. Further studies have confirmed that sucralose, unlike other artificial
6 sweeteners, presents a legitimate alternative to sugar in many cooking and baking
7 applications.[3] Based upon these taste tests, Dr. Henry Lawless, a Professor of Food
8 Science at Cornell University, will testify at trial that the taste profiles of Splenda
9 and sugar are very similar.

10    Plaintiffs appear to be prepared to argue at trial that that the claim that
11 Splenda "tastes like sugar" is false because Splenda allegedly does not offer the
12 *exact same* taste characteristics as sugar. But the evidence at trial will prove that –
13 through decades of advertising in the low calorie sweetener industry – the phrase
14 "tastes like sugar" has come to mean offering a sweet taste *similar*, but not
15 necessarily identical, to that of sugar. McNeil will show at trial that artificial
16 sweeteners on the market have been advertised as "tasting like sugar," even those
17 sweetened with artificial ingredients, such as saccharin and acesulfame potassium
18 ("ace-K"), that offer a much less sugar-like taste than sucralose. For example, the
19 artificial sweeteners Sugar Twin® and NatraTaste® include a large "Tastes like
20 Sugar" banner right on the front of their boxes, while Equal® has long been
21 advertised as "tast[ing] like natural sugar." This evidence of industry usage will
22 establish that "tastes like sugar" as it appears in McNeil's ads means simply that
23 Splenda offers a taste "similar" to that of sucrose, something the sweetener
24 undeniably does.

25
26 [3] Sucralose is highly stable even at high temperatures. Other sugar substitutes, such as
aspartame, break down when heated and lose their sweetness. The introduction of
27 Splenda thus represented a major innovation in the no-calorie sweetener category as
consumers could purchase a sweetener that both tastes like sugar and could be used in
28 cooking and baking applications that had long been the sole domain of sugar.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1    Indeed, the fact that Splenda starts from sugar and ends up tasting like
2    sugar is no coincidence.  Despite the atomic changes that occur during the
3    manufacturing process, sucralose retains the essential molecular structure of sugar.
4    That structure gives Splenda its sweet taste.  Even prior to the launch of Splenda,
5    research conducted by scientists at McNeil and Tate & Lyle (the sugar company
6    that discovered sucralose) indicated that the sugar-like taste of sucralose is a
7    product of its sugar origins.  More recent independent research spearheaded by Dr.
8    Steven Munger, a tenured Associate Professor of Anatomy and Neurobiology at the
9    University of Maryland School of Medicine, confirmed this connection.

10    Sucralose has been proven to bind to, and activate, the human taste
11    receptor responsible for detecting sweetness in essentially the same way as sugar
12    whereas other artificial sweeteners do not.  Accordingly, the claim that Splenda is
13    "made from sugar so it tastes like sugar" is literally true.[4]

14                    **3.    Consumers Are Not Misled by Splenda Advertising**

15    The claims that McNeil actually makes in Splenda advertising are
16    unambiguous and entirely accurate.  Plaintiffs nonetheless contend that, in context,
17    the Splenda slogan and tagline mislead consumers to believe that Splenda actually
18    "contains sugar," "is natural," "is safe" and "is as safe as sugar."  *William H.*
19    *Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995).  Plaintiffs, however,
20    cannot prevail on their claims of implied falsity because Splenda advertising does
21    not lead a "significant portion" of consumers to hold these beliefs.  *Id.*; *see also*
22    *Mut. Pharm. Co v. Ivax Pharms., Inc.*, 459 F. Supp. 2d 925, 946 (C.D. Cal 2006).

23    As a preliminary matter, plaintiffs have failed to even plead that

24

-----

25    [4] In 1990, a decade before the launch of Splenda, FDA reviewed proposed labeling for
      Splenda that included, among other things, the claims that "Splenda Low-Calorie
26    Sweetener is more like sugar than any other low-calorie sweetener because it's the only
      one that's created from sugar" and "tastes like sugar, with no unpleasant aftertaste."  As
27    McNeil's minutes from its meeting with the agency reflect, "[e]ach of the FDA
      representatives reviewed the proposed labeling and made no objections or suggestions for
28    change."

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   McNeil's advertising implies that Splenda is safe or "a safe as sugar." As such, on
2   that basis alone, they should not be permitted to proceed to trial with those issues.[5]
3   Even if they could overcome that hurdle, plaintiffs have no evidence that any, let
4   alone a significant portion of, consumers take away from Splenda advertising a
5   message that Splenda "is as safe as sugar." *See Heary Bros. Lightning Protection*
6   *Co. v. Lightning Protection Inst.*, 287 F. Supp. 2d 1038, 1069 (D. Ariz. 2003)
7   (rejecting claim absent evidence that ads convey the particular implied message
8   alleged to be false).  Even so, to the extent that Splenda advertising reassures some
9   consumers that Splenda is safe, that message is true.  By contrast, sugar is
10  associated with a host of ill-health effects and medical conditions.

11          Nor is it true that Splenda advertising conveys the message that
12  Splenda is "natural sugar" with the calories somehow filtered out.  Plaintiffs'
13  contentions, indeed, are belied by the plain words that McNeil uses in its
14  advertising.  A consumer's own common sense would tell her that a sweetener that
15  is "made *from*" sugar and "tastes *like*" is not sugar.  To the extent that a *de minimis*
16  percentage of consumers might misunderstand or misinterpret McNeil's ads in the
17  manner plaintiffs allege, such miscommunication is not actionable. *See First*
18  *Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 805 (7th Cir. 2001)
19  ("[I]t is doubtful that the Lanham Act may be employed to ensure that language,
20  used in accord with normal rules of grammar and diction, cannot be
21  misinterpreted").

22          Consumer research also confirms that virtually no one exposed to
23  Splenda advertising is led to believe that Splenda is natural sugar without the
24  calories. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th
25  Cir. 1997) (whether ads convey allegedly false message to a substantial segment of
26  consumers is "typically tested through the use of consumer surveys").  Among
27  _____
[5] Although the Court has yet to issue a written opinion, during oral argument on
28  December 17, 2007, the Court indicated such an Order would be forthcoming precluding
plaintiffs from proceeding with their "safety" Lanham Act claims.

1    other studies, a nationally representative consumer survey conducted by Dr. Susan

2    McDonald, President and CEO of National Analysts Research and Consulting, one

3    of the nation's leading market research firms, demonstrates that Splenda packaging

4    induces few, if any, consumers to believe that Splenda "contains real, natural

5    sugar." Even fewer consumers take away a message that Splenda is "natural."

6            The results of Dr. McDonald's survey are corroborated by the findings

7    of another survey conducted by Mr. Robert Klein of Applied Marketing Science.

8    Mr. Klein surveyed over 500 prior Splenda purchasers throughout the country and

9    asked them what motivated their first purchase of Splenda. In response, only 5.3%

10    of consumers mentioned a belief that Splenda is "natural" as playing any role in

11    their decision-making and only 1.3% answered in a manner that suggested they

12    believed Splenda contained actual sugar. When repeat Splenda purchasers were

13    asked why they had purchased Splenda a second time, only 3% of consumers

14    responded that they did so because they thought Splenda was "natural" and only

15    one repeat purchaser (0.3% of respondents) responded that he did so because

16    Splenda "contains actual sugar."

17            The McDonald and Klein surveys also highlight the defects in the two

18    consumer surveys conducted by Dr. Itamar Simonson in support of plaintiffs'

19    allegations. In both surveys, Dr. Simonson relied on a series of highly suggestive

20    closed-ended questions that asked consumers to "estimate" (using a scale of 1-100)

21    how much sugar is in Splenda and Equal, and how "natural" those products are.

22    On the basis of those questions, Dr. Simonson concludes that consumers tend to

23    rate Splenda slightly "higher" than Equal both in terms of sugar content and

24    "naturalness." Dr. McDonald's survey proves that Dr. Simonson's results –

25    whatever plaintiffs contend the jury is supposed to make of them – are entirely the

26    result of the leading questions and unorthodox survey methods that he used.

27    Furthermore, at trial, Dr. Michael Mazis, a Professor of Marketing at the American

28    University Kogod School of Business and a renowned expert in marketing and

**MCNEIL MEMO OF FACT AND LAW**
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1    consumer survey research, will offer a comprehensive and ultimately devastating
2    critique of Dr. Simonson's flawed litigation surveys.

3            Relying on the results of the four litigation surveys to be offered at
4    trial, Dr. Mazis concludes that consumers overwhelmingly do not take away from
5    Splenda promotions the allegedly implied claims that Splenda "is natural" or "is
6    sugar," and almost never cite such beliefs as their reason for purchasing Splenda.
7    In his many years of experience as a consultant to the Federal Trade Commission,
8    Dr. Mazis has never recommended that the Commission pursue a case of false
9    advertising when surveys indicated such *de minimis* levels of consumer confusion.
10   As a seasoned expert in market research, Dr. Mazis will opine that a substantial
11   portion of consumers have not been, and are unlikely to be, deceived by Splenda
12   advertising.

13              **4.    McNeil Did Not Intend to Deceive Consumers**

14           Despite overwhelming evidence that consumers are not misled by
15   Splenda advertising, plaintiffs plan to argue at trial that substantial consumer
16   confusion can be *presumed* because McNeil purportedly set out to deceive
17   consumers through deliberately fraudulent conduct of an egregious nature. *Johnson*
18   *& Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms.*, 19
19   F.3d 125, 131-32 (3d Cir. 1994).  But McNeil never intended to deceive consumers.
20   Rather, McNeil set out to develop credible selling message that would give
21   consumers a "reason to believe" that Splenda would be "close to sugar" in both
22   taste and performance.

23           "Made from sugar so it tastes like sugar" encapsulates the "sugar-like"
24   properties of Splenda and, when Splenda first debuted in the United States, it
25   signaled that Splenda was a new and different sweetener.  This may have comforted
26   some consumers who had concerns about the safety of aspartame and saccharin
27   (sweeteners that historically had been dogged by reports linking them to cancer and
28   other maladies).  But McNeil's primary purpose behind its "made from sugar so it

- 11 -

1   tastes like sugar" claim was to assure consumers that Splenda does, in fact, taste
2   like sugar. Taste is the single most important factor consumers weigh in deciding
3   which artificial sweetener to buy, so it was important for McNeil to assure the
4   public that Splenda had an authentic, sugar-like taste.

5          McNeil had every interest in ensuring that consumers understood that
6   Splenda is not sugar but a new and different sweetener with sugar-like properties.
7   Well before launch, McNeil identified consumers with diabetes (or members of
8   their families) as a prime target audience for Splenda. Given the sensitivity to sugar
9   intake in diabetic households, McNeil recognized the importance of delivering the
10  message that Splenda, while made from sugar, did not actually contain sugar.

11         Thus, McNeil distributed brochures and fact sheets to consumers,
12  industrial ingredient customers, and the press explaining that Splenda "is made
13  from sugar through a patented, multi-step process" that "replaces three hydrogen-
14  oxygen groupings on the sugar molecule with three chlorine atoms." McNeil
15  contractually prohibited companies that used Splenda as an ingredient in their
16  products from labeling them as "natural." And McNeil devised an introductory
17  television commercial that announced that Splenda is made from sugar so it tastes
18  like sugar, "but it's not sugar."

19         McNeil was equally intent on not portraying Splenda as a "natural"
20  sweetener. McNeil's advertisements, website, and other consumer communications
21  contain language or images that indicate that Splenda is an artificial sugar
22  substitute. Splenda advertising and packaging furthermore has consistently
23  identified Splenda as a no calorie sweetener, a term which consumers readily
24  associate with artificial sweeteners.

25         Years of internal market research conducted by McNeil confirmed that
26  consumers well understood that Splenda is not "truly natural," though consumers
27  will sometimes draw distinctions between artificial sweeteners – based on taste,
28  versatility, origins, etc. – that lead them to characterize competing sweeteners as

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   "more natural" or "less artificial" than one another.

2           In point of fact, over a year before this suit was brought, in July 2003,
3   McNeil conducted a review of its internal market research for insights regarding
4   whether consumers perceive Splenda as "natural" or are otherwise confused about
5   the essential properties of Splenda.  After a comprehensive review of McNeil's
6   market research, including years of copy tests, tracking studies, and focus group
7   research, McNeil concluded that its Splenda advertising was demonstrably "not
8   communicating natural."  That conclusion is shared by Dr. Ivan Ross, former
9   Chairman of the Marketing Department at the University of Minnesota Business
10  School, who has concluded that McNeil's internal market research confirms that
11  very few, if any, consumers are confused about the makeup of Splenda.

12          Far from deliberately fraudulent conduct of an egregious nature,
13  McNeil's efforts to position Splenda as "close to sugar" simply elaborated on
14  themes that had been common in advertisements for artificial sweeteners for
15  decades.  *See Hot Wax v. Turtle Wax*, 191 F.3d 813, 826 (7th Cir. 1999) (assessing
16  advertiser's intent in light of "evidence of industry and consumer expectations").
17  As far back as the 1980s, for example, commercials for Equal proclaimed that
18  "Equal goes" almost "everywhere sugar goes" and promised consumers "all these
19  sweet sensations" of sugar "without all the calories."  Advertisements for
20  NutraSweet, another aspartame brand, similarly described it as "Today's Sugar."
21  Other aspartame and saccharin brands (*e.g.*, Natrataste and Sugar Twin) closely
22  aligned their products with sugar by prominently featuring the phrase "Tastes Like
23  Sugar" on their packaging.

24          In addition to touting their "sugar-like" properties, makers of artificial
25  sweeteners also had a long history of educating consumers about the "origins" of
26  their products.  Beginning in 1984, for example, commercials for Equal sought to
27  assuage consumers' apprehensions about aspartame by explaining that Equal
28  (which is made by combining two amino acids) "is made with nutrients like those

- 13 -

1   found in many foods we eat." Years later, ads showed bowls of fruits or beans and
2   described NutraSweet as "made of two building blocks of protein, like those that
3   make up things we eat every day."

4       McNeil's decision to promote Splenda as a new, no-calorie sweetener
5   that is "made from sugar so it tastes like sugar" was thus in keeping with industry
6   practice, and with messages that consumers had heard for years.

7       **5.    Interstate Commerce**
8       The parties have stipulated that this element has been met.

9       **6.    Mistaken Beliefs Are Not Material to Consumers'**
10          **Decisions to Purchase Splenda**

11      Plaintiffs claims also must fail because the false messages plaintiffs
12  contend are lurking in Splenda ads are not "likely to influence the purchasing
13  decisions." *In re Century 21-RE/MAX Real Estate Advertising Claims Litig.*, 882 F.
14  Supp. 915, 924 (C.D. Cal. 1994). To the contrary, the consumer survey conducted
15  by Mr. Klein proves that mistaken beliefs were not material to prior Splenda
16  buyers' reasons to purchase or repurchase Splenda. Thus, to the extent plaintiffs
17  contend that widespread consumer confusion as to the "naturalness" or "sugar
18  content" of Splenda accounts for the product's remarkable success, the findings of
19  the Klein survey prove otherwise. Relying on the Klein survey as well as market
20  research commissioned by McNeil in the normal course of business, Dr. Ross has
21  concluded, and will testify at trial, that the taste of Splenda, its versatility and
22  consumers' desire to try something new have been the material drivers of McNeil's
23  success.

24      **7.    Plaintiffs Have Not Been Injured as a Result of Any**
25          **Alleged Deception**

26      Plaintiffs' claims of false and misleading advertising are entirely
27  without merit but, even assuming plaintiffs could succeed on their claims, the injury
28  plaintiffs have purportedly suffered and the damages plaintiffs' are seeking are

- 14 -

wildly exaggerated. Dr. Marion Stewart, an economist affiliated with National Economic Research Associates, will demonstrate that plaintiffs' damages claims are premised on a series of faulty assumptions. Among other flaws identified by Dr. Stewart, plaintiffs' damages expert, Dr. Christian Tregillis, wrongly assumes that most consumers purchase Splenda on the basis of mistaken beliefs; that Splenda sales have come largely at the expense of sugar; and that, but for McNeil's alleged false advertising, the market share of Splenda would have followed an arbitrary and low "trend" over time.

Relying instead on data reflecting actual consumer purchasing patterns, and the results of Mr. Klein's survey concerning the reasons consumers actually buy and repurchase Splenda, Dr. Stewart calculates that McNeil's allegedly false advertising, at most, resulted in $325,000 in lost profits to the five sugar companies that are plaintiff-interveners in this case. McNeil's profits from those purportedly diverted sales were, at most, $2.4 million.

The minimal impact of Splenda is perhaps not surprising given the variety of other factors that have recently affected the sugar industry, including the popularity of low-sugar and low-carbohydrate diets, weather events (including Hurricane Katrina) that affected sugar crops, and international treaties that have helped foreign competitors enter the United States marketplace and compete with the Sugar Association member companies. In fact, one Sugar Association member likened Splenda to a "gnat on an elephant" when compared to the impact on the sugar industry from the Central American Free Trade Agreement.

Plaintiffs' demand of an additional $150 million in order to conduct an expansive multi-year "corrective advertising" campaign that reaches every adult American is similarly unwarranted and unreasonable. According to Professor Mazis, who has advised the FTC in cases involving corrective advertising and written extensively on the subject, the corrective advertising campaign proposed by the plaintiffs is unprecedented in its size, not grounded in any accepted rationale for

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
**CV 04-10077 DSF (RZX)**

1   corrective advertising, and unnecessary.  From an economic standpoint, Dr. Stewart
2   will testify that plaintiffs' proposed corrective advertising campaign would
3   constitute an economic and competitive windfall to the plaintiffs.

4                **8.    Plaintiffs' Claims Are Barred By Laches**

5            In the Ninth Circuit, if a Lanham Act claim "is filed after the
6   analogous limitations period has expired, the presumption is that laches is a bar to
7   suit." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.,* 304 F.3d 829, 837 (9th Cir.
8   2002).  The analogous limitations period for plaintiffs' false advertising claim is
9   three years from the time plaintiffs knew or should have known of the objectionable
10  conduct. *See id.* at 838; *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir.
11  2001).  The proof at trial will show that plaintiffs unreasonably delayed by four (in
12  the case of the Sugar Association) and five (in the case of the plaintiff-intervenors)
13  years prior to commencing this lawsuit and that McNeil was substantially
14  prejudiced thereby.  As a result, the evidence will establish that plaintiffs' claims
15  are barred by laches.

16           Sucralose, the sweetening ingredient in Splenda, was approved by
17  FDA as a food additive in 1998 and as a general purpose sweetener in 1999.
18  Following FDA approval, in September 2000, McNeil launched Splenda in retail
19  stores throughout the country.[6]  Since the retail launch over seven years ago,
20  McNeil has emphasized the sugar origins and sugar-like taste of Splenda across all
21  forms of media.  Indeed, the Splenda product packaging, individual serving packets,
22  television and print ads, and press releases and statements have all advertised
23  Splenda as "made from sugar" and "tastes like sugar" since at least the time of
24  launch.  These claims remain an important part of the brand positioning today.

25           The "made from sugar, tastes like sugar" positioning was not lost on
26  the Sugar Association and the other plaintiffs in this case.  The sugar industry

27  ───────────
    [6] Even before the nationwide launch of Splenda, there were press reports and other
28  publicly available information about the product that would have put plaintiffs on notice
    of the new potential competitor.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   immediately recognized Splenda as a competitive threat, given that it is the first
2   sugar substitute that both offers a sugar-like taste and can be used in cooking and
3   baking in much the same way as sugar.  For example, Richard Keelor, the former
4   President and CEO of the Sugar Association, saw the Splenda advertising right
5   around the time of launch and determined that McNeil was "aggressively"
6   promoting Splenda as if it were "sugar with zero calories."  Soon after the Splenda
7   launch, Dr. Keelor and his staff concluded that McNeil's advertising would mislead
8   consumers into believing that Splenda is a natural product.

9            Given these concerns, in December 2000, Dr. Keelor drafted a letter to
10  McNeil demanding support for McNeil's "made from sugar, tastes like sugar"
11  claim.  Notably, Dr. Keelor never sent this letter and never alerted McNeil of his
12  concerns.  Instead, in February 2001, Dr. Keelor drafted a memorandum to the
13  Sugar Association's Board of Directors to warn them of his "concerns regarding the
14  marketing efforts on behalf of Splenda" because "any threat to [sugar] consumption
15  merits our immediate and concentrated attention."  According to the February 2001
16  memo, the "Association has been actively tracking the marketing and advertising
17  efforts used in the Splenda campaign" and "these efforts concern us deeply because
18  they use many of the same messages used by the sugar industry."  The memo
19  concluded by proposing "two immediate options" to respond to McNeil's
20  advertising: "to pursue the issue independently or to challenge the claims through
21  the National Advertising Division (NAD) of the Better Business Bureau."  As the
22  record reflects, plaintiffs took no actions on these concerns for nearly four years,
23  when the Sugar Association finally filed its Complaint.

24           Over the next several years, the Sugar Association and the other
25  plaintiffs stewed and grumbled over McNeil's advertising, but never took any
26  action actually to challenge it.  In 2002, for example, the plaintiffs griped among
27  themselves about McNeil's "aggressive advertising campaign" aimed to "capitalize
28  in the public' [sic] misperception that Splenda is 'a natural product and made from

1  sugar'" and forecasted that the sugar industry's losses from Splenda would be

2  "catastrophic."[7]  In 2003, the Sugar Association and the Merisant Company, the

3  makers of Equal, entered into an alliance to conduct an anti-Splenda publicity

4  campaign.  Later that year, representatives from Merisant gave a presentation to the

5  Sugar Association's Board of Directors "to outline possible litigation concerning

6  the promotion[,] advertising and labeling" of Splenda "in which the Sugar

7  Association would participate with Merisant with respect to the costs and

8  presumably all strategic decisions."  In October 2003, the Board determined to

9  forego litigation and instead file a complaint with the Federal Trade Commission

10  and send a cease and desist letter to McNeil.[8]

11          Again, however, plaintiffs did not take either of these actions.  Indeed,

12  the Sugar Association did not challenge McNeil's advertising in any way until

13  December 2004 – over four years after the nationwide Splenda launch.  A year

14  later, in November 2005, the plaintiff-interveners finally filed their own Complaint

15  in Intervention.

16          By the time plaintiffs finally commenced suit, McNeil had made an

17  enormous and irreversible commitment in the Splenda advertising campaign.

18  _____

19  [7] According to plaintiffs, a full third of new Splenda volume came from sugar users in the first few years that Splenda was on the market.

20  [8] Plaintiffs claim that their delay was somehow warranted because, allegedly, McNeil

21  shifted from an initial focus on the artificial sweetener market to a later focus on the sugar market.  In support of this allegation, plaintiffs point to only three tweaks to the Splenda ad campaign:  (1) "the elimination of the 'not sugar' disclosure" from McNeil's second

22  generation TV ads; (2) the 2003 introduction of the 5 pound Splenda Baker's Bag; and (3) the 2004 introduction of Splenda Sugar Blend for Baking.

23  The evidence at trial will establish that plaintiffs' progressive encroachment argument is

24  nothing more than a post hoc rationalization for their tardy claims.  As an initial matter, plaintiffs' contemporaneous documents and recent admissions make clear that they have

25  always recognized Splenda as a serious and unique competitive threat.  This alone dooms their progressive encroachment claim.  Moreover, the language "but its not sugar" was

26  only used in McNeil's initial TV advertisement – and not in any of its other contemporaneous advertising – and Dr. Keelor, the head of the Sugar Association at the

27  time, specifically disavowed that this language played any role in the delay.  Finally, neither the five-pound Splenda bag, which is simply a larger package for the same

28  granular product that has been available since launch, nor the Sugar Blend product, which doesn't even include the "made from sugar" claim, can possibly justify plaintiffs' delay.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   Indeed, by the end of 2004, McNeil had devoted over *$125 million* to a marketing
2   campaign that was centered upon the claims that Splenda is "made from sugar" and
3   "tastes like sugar."  Today – seven years after the Splenda debut – McNeil has
4   invested in excess of $270 million into establishing Splenda as *the* no-calorie
5   sweetener that's "made from sugar so it tastes like sugar."  This investment,
6   coupled with its unique product advantages, has made Splenda the leading branded
7   sweetener in the United States today.

8          The evidence will show that had plaintiffs successfully sued earlier,
9   McNeil would have chosen an alternative marketing strategy for Splenda.
10  Moreover, as a result of plaintiffs' delay, the consequences of a judgment against
11  McNeil are exponential greater.  Should plaintiffs now succeed, McNeil stands to
12  lose a brand identity it has established in the minds of American consumers,
13  credibility with its loyal customers and, if plaintiffs get their way, hundreds of
14  millions of dollars in profits that McNeil earned after the time when plaintiffs'
15  claims should have been brought.  Accordingly, the evidence will show, plaintiffs'
16  claims are barred by laches.

17                    **9.    Plaintiffs' Hands are "Unclean"**

18          As discussed in detail in Part III.C. below, counterclaim defendants
19  and their public relations firm Qorvis Communications have disseminated
20  numerous outright lies and falsehoods about Splenda and its safety as part of its
21  "The Truth About Splenda" campaign.  Plaintiffs should be precluded from
22  recovering on their claims against McNeil because, in light of plaintiffs' fraudulent
23  and egregious conduct designed to disparage Splenda, any recovery by the plaintiffs
24  would be inequitable.

25
26
27
28

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

III.   **MCNEIL'S COUNTERCLAIM AND COUNTERCLAIM-DEFENDANTS' AFFIRMATIVE DEFENSES**

    A.   **McNeil's Counterclaims**

**Counterclaim 1:** **The Counterclaim Defendants have engaged in false or misleading advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).**

    i)   In advertisements, the counterclaim defendants made false or misleading statements of fact about Splenda.

    ii)   Those advertisements actually deceived a substantial segment of their audience.

    iii)   Such deception is material, in that it is likely to influence the purchasing decision of consumers.

    iv)   Counterclaim defendants made their statements in interstate commerce or in such a way as to have an impact on interstate commerce.

    v)   McNeil has been or is likely to be injured as a result of the false or misleading statements.

    *See Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718, 731 (9th Cir. 2007); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *Cook, Perkiss, and Liehe, Inc. v. N. Cal. Collection Serv.*, 911 F.2d 242, 244 (9th Cir. 1990); *Cairns v. Franklin Mint Co.*, 24 F. Supp. 2d 1013, 1036 (C.D. Cal. 1998); *In re Century 21-Remax Real Estate Adver. Claims Litig.*, 882 F. Supp. 915, 922 (C.D. Cal. 1994).

**Counterclaim 2:** **The Counterclaim Defendants have engaged in false advertising in violation of § 17500 of the California Business**

- 20 -

1    & **Professions Code the False Advertising Law or**
2    **"FAL").**

3        i)      Counterclaim defendants intended to sell a product or
4                service; and

5        ii)     Counterclaim defendants publicly disseminated
6                advertising which:

7                a.      contained a statement which was untrue or
8                        misleading; and

9                b.      defendant knew, or in the exercise of reasonable
10                       care should have known, was untrue or misleading;
11                       and

12               c.      concerned the product or service or their
13                       disposition or performance.

14       iii)    McNeil suffered injury in fact and has lost money or
15               property as a result of the false advertising.

16

17               *Cal. Bus. & Prof. Code §§17500, 17204 & 17535.  See*
18               *also, e.g., Daghlian v. DeVry University, Inc., 461 F.*
19               *Supp. 2d 1121, 1153-1155 (C.D. Cal. 2006); Kasky v.*
20               *Nike, Inc., 27 Cal. 4th 939, 950-951 (2002); Colgan v.*
21               *Leatherman Tool Group, Inc., 135 Cal. App. 4th 663, 679*
22               *(2006).*

23   **Counterclaim 3:**   **The Counterclaim Defendants have engaged in product**
24                         **disparagement/trade libel in violation of the law of the State**
25                         **of California.**

26       i)      The counterclaim defendants published a disparaging
27               statement about Splenda, McNeil or its advertising.

28

1               ii)    The statement was reasonably understood by one or more

2                        of the persons to whom it was published to be a statement

3                        of fact concerning Splenda, McNeil or its advertising.

4               iii)   The statement was false.

5               iv)   The counterclaim defendants published the statement with

6                        either express or implied malice.

7               v)    The publication of the statement caused McNeil to suffer

8                        financial loss.

9

10                       *See Matthew Bender, 6-70A California Forms of*

11                       *Instruction, Elements of a Trade Libel Cause of Action,*

                           *MB 7000A.01 (modified).*

12

13    **Counterclaim 4:**  **The Counterclaim Defendants have engaged in unfair**

14                     **competition in violation of § 17200 of the California Business**

15                     **and Professions Code (the Unfair Competition Law or**

16                     **"UCL").**

17               i)     The counterclaim defendants engaged in business acts or

18                        practices that are (1) unlawful, (2) unfair, or (3)

19                        fraudulent; and

20               ii)    An "unlawful practice" is a practice that is forbidden by

21                        statute (state or federal), regulation, or decisional law.

22               iii)   To show that counterclaim defendants engaged in

23                        "unfair" business acts or practices, McNeil must show

24                        that counterclaim defendants' practices threaten an

25                        incipient violation of an antitrust law, or violate the policy

26                        or spirit of one of those laws because their effects are

27                        comparable to or the same as a violation of the law, or

28                        otherwise significantly threatens or harms competition.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

iv)  To show that counterclaim defendants engaged in "fraudulent" business acts or practices, McNeil must demonstrate that members of the public are likely to be deceived by counterclaim defendants' practices. The test for likelihood of deception is whether counterclaim defendants' practices are misleading to a reasonable consumer.

v)  McNeil suffered injury in fact and has lost money or property as a result.

*Daghlian v. DeVry University, Inc., 461 F. Supp. 2d 1121, 1154-55 (C.D. Cal. 2006); Lippitt v. Raymond James Fin. Servs., Inc., 340 F.3d 1033, 1043 (9th Cir. 2003); Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 539 (Cal. 1999); First Advantage Background Servs. Corp. v. Private Eyes, Inc., No. C-07-2424, 2007 WL 2572191, at \*5 (N.D. Cal. Sept. 5, 2007); Comm. on Children's Television, Inc. v. Gen. Foods Corp., 673 P.2d 660, 668 (Cal. 1983); Watson Labs., Inc. v. Rhone-Poulenc Rorer, Inc., 178 F. Supp. 2d 1099, 1121 (C.D. Cal. 2001); Freeman v. Time, Inc., 68 F.3d 285, 289 (9th Cir. 1995); Heighley v. J.C. Penney Life Ins. Co., 257 F. Supp. 2d 1241, 1260 (C.D. Cal. 2003); Farmers Ins. Exch., 2 Cal. 4th 377, 383 (1992).*

**B.    Counterclaim Defendants' Affirmative Defenses**

**Defense 1:  McNeil's claims are barred by unclean hands.**

i)  McNeil has acted inequitably through fraudulent conduct of an egregious nature.

- 23 -

1         ii)    McNeil's inequitable conduct directly relates to the
2                 subject matter of its claims.

3       *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829,
4       841-42 (9th Cir. 2002); *Dollar Sys., Inc. v. Avcar Leasing Sys.,*
5       *Inc.*, 890 F.2d 165, 173 (9th Cir. 1989); *Fuddruckers, Inc. v.*
6       *Doc's B.R. Others, Inc.*, 826 F.2d 837, 847 (9th Cir. 1987);
7       *Citizens Fin. Group v. Citizens Nat'l Bank*, 383 F.3d 110, 129
8       (3d Cir. 2004).

9   **Defense 2:  McNeil's claims are barred by the First Amendment.**

10        i)    The challenged statements by counterclaim defendants
11                were made in furtherance of, or incidental to, a bona fide
12                effort to petition the government for redress of
13                grievances.

14        ii)    Counterclaim defendants' petitioning activity was not a
15                sham designed to conceal what is really an effort to injure
16                McNeil or stifle competition.

17      *See Eastern Railroad Presidents Conference v. Noerr Motor*
18      *Freight, Inc., 365 U.S. 127, 144 (1961); Allied Tube & Conduit*
19      *Corp. v. Indian Head, Inc., 486 U.S. 492, 507 (1988); Sosa v.*
20      *DirecTV, Inc., 437 F.3d 923, 938 (9th Cir. 2006); Kottle v.*
21      *Northwest Kidney Centers, 146 F.3d 1056, 1060 (9th Cir.*
22      *1998); Clipper Exxpress v. Rocky Mountain Motor Tariff*
23      *Bureau, Inc., 690 F.2d 1240, 1252 (9th Cir. 1982).*

24  **Defense 3:  McNeil Has Waived Its Right to Prevail on its Counterclaims**

25        i)    McNeil (1) voluntarily, (2) knowingly, and (3)
26                intentionally relinquished or abandoned a known legal
27                right.

28

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1               ii)      Counterclaim defendants were prejudiced by McNeil's

2                      conduct that gave rise to the alleged waiver.

3             *Cortez v. Purolater Air Filtration Products Co.*, 23 Cal. 4th 163,

4             179 (2000); *Dole v. Bakersfield Inc. v. Workers' Comp. Appeals*

5             *Bd.,* 64 Cal. App. 4th 1273, 1277 (1998); *Van Ness Townhouses*

6             *v. Man Indus. Corp.* 862 F.2d 754, 758 (9th Cir. 1988); *U.S. on*

7             *Behalf and for the Benefit of Army Athletic Ass'n v. Reliance Ins.*

8             *Co.*, 799 F.2d 1382, 1387 (9th Cir. 1986); *Mardirosian v.*

9             *Lincoln National Life Ins. Co.*, 739 F.2d 474, 477 (9th

10             Cir.1984).

11      **C.**      **Key Evidence in Support of McNeil's Counterclaims and In**

12             **Opposition to Counterclaim Defendants' Affirmative**

13             **Defenses**

14             **1.**      **False or Misleading Statements of Fact About Splenda**

15                    **in Advertising**

16          At trial, McNeil will establish that the counterclaim defendants have

17 disseminated false or misleading statements of fact about Splenda in their

18 advertising.  McNeil may fulfill this element by showing either that (1) the

19 counterclaim defendants made a statement that is literally false on its face, (2) the

20 counterclaim defendants made a statement that is literally false by necessary

21 implication, or (3) the counterclaim defendants made a statement that is misleading

22 in context. *See Southland,* 108 F.3d at 1139-40; *Cook*, 911 F.2d at 245.

23          A statement is literally false on its face when it explicitly states

24 something that is untrue. *See In re Century 21-RE/MAX Real Estate Adver. Claims*

25 *Litig.*, 882 F. Supp. 915, 922 (C.D. Cal. 1994).  Even if the precise words of a claim

26 are not literally false, however, the claim still may be "false by necessary

27 implication." *See Southland*, 108 F.3d at 1140; *Time Warner Cable, Inc. v.*

28 *DIRECTV, Inc.*, 497 F. 3d 144, 158 (2d Cir. 2007); *Novartis Consumer Health, Inc.*

1   *v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586-97 (3d

2   Cir. 2002). A statement is false by necessary implication when considering the

3   advertisement in its entirety, the audience would recognize the untrue claim as

4   readily as if it had been explicitly stated. *See Novartis*, 290 F.3d at 586-87.

5   Finally, a statement is "misleading" when it is literally true but, due to its context, it

6   actually deceives the consuming public. *See Southland*, 108 F.3d at 1140; *William*

7   *H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995).

8          As the facts below establish, the counterclaim defendants have made

9   numerous statements in their advertising that are both false (either on their face or

10  by necessary implication) and misleading.

11              **2.    The Unblemished Safety Record of Splenda**

12         The safety of Splenda is unimpeached. Before Splenda was launched

13  throughout the United States, its sweetening ingredient, sucralose, underwent two

14  decades of intense scientific testing. In 1987, McNeil submitted a 21,000-page

15  application to the U.S. Food and Drug Administration (FDA) seeking a finding that

16  sucralose is safe and suitable for use as a food additive. For a food additive to

17  receive FDA approval, it must conclude that the product is safe, meaning that there

18  is reasonable certainty of no harm to consumers when the product is used as

19  proposed.

20         The safety of sucralose has been confirmed by exhaustive studies.[9] As

21  part of the U.S. government's approval process for sucralose, the Food and Drug

22  Administration reviewed over 100 studies in several species, including humans,

23

---

24  [9] The presence of bulking agents in Splenda does not affect its safety. Maltodextrin and
    dextrose, food additives found in thousands of food products, are generally recognized as
25  safe (GRAS) under applicable FDA regulations. As a result, sucralose – the only novel
    ingredient in Splenda – was the only ingredient that required FDA approval before
26  Splenda could be marketed. Plaintiffs have no evidence that maltodextrin and dextrose,
    alone or in combination with sucralose, are unsafe. At best, Plaintiffs' experts would
27  testify that their rat study allows them to hypothesize that the combination of sucralose
    and bulking agents may have a different effect on weight gain compared to sucralose
28  alone, but they admit the hypothesis has never been tested.

1  supporting the safety of sucralose including pharmacokinetic and metabolic studies,
2  genotoxicity assays, carcinogenticity studies, reproductive and developmental
3  toxicity studies, body weight gain studies, immunotoxicity studies, neurotoxicity
4  studies and studies in sensitive human populations, including people with diabetes.
5  Many of the submitted studies had been published and peer reviewed.  In addition,
6  McNeil submitted a report from a panel of independent experts in various scientific
7  disciplines who evaluated the sucralose data and deemed the substance to be safe
8  for human consumption.

9         In 1998, more than a decade after McNeil first submitted its
10  application, FDA presented its final conclusion on sucralose:

11         The agency has evaluated all the data in the petition and other
12         information and concludes *the proposed uses of sucralose are safe*. . .
13         . The food additive sucralose *may be safely used* as a sweetening
14         agents in foods . . . .

15         Shortly after this decision, McNeil petitioned to expand the range of
16  foods in which sucralose may be used.  FDA's reevaluation of the safety of
17  sucralose led to the same conclusion:  "The agency concludes that sucralose *may be*
18  *safely used* as a sweetener in food generally."  Finally, in 2006, in response to
19  McNeil's application to permit the health claim that sucralose (unlike sugar) "does
20  not promote tooth decay," FDA reaffirmed its earlier conclusion that "the use of
21  sucralose as a non-nutritive sweetener in food is safe and lawful."

22         With these decisions, FDA joined a list of international regulatory
23  agencies that have reviewed the scientific data concerning sucralose and deemed it
24  to be completely safe.  Among these leading international bodies are the World
25  Health Organization's Joint Expert Committee on Food Additives, the European
26  Commission's Scientific Committee on Food, Health Canada, and Food Standards
27  Australia/New Zealand.  Dr. Ian Munro, a Professor of Nutritional Sciences at the
28  University of Toronto, has studied the large body of scientific evidence that

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1    establishes the safety of Splenda and will debunk plaintiffs' contrary position at
2    trial.

3         Splenda is now sold in more than 80 different countries and can be
4    found in over 4,000 foods and beverages.  Since FDA approval in 1998, millions of
5    Americans, including children, pregnant women and people with diabetes, have
6    safely used Splenda as their sugar substitute of choice.  Indeed, by the end of 2006,
7    McNeil had sold more than *41 billion* packets of Splenda to U.S. customers.

8         Plaintiffs' "evidence" concerning the safety of Splenda is based on
9    irrelevant and unreliable data.  No peer-reviewed publications support the idea that
10   Splenda is unsafe or causes any of the health problems alleged by plaintiffs'
11   experts.  Those experts rely solely on the results of their own laboratory study in
12   rats, which was so poorly designed, executed, and reported that even they will no
13   longer stand by the report of their work.  Furthermore, the opinions that these
14   experts draw from the results of the rat study are based on erroneous data, rest on
15   unreasonable and unscientific leaps of logic, and amount to no more than a handful
16   of untested hypotheses.

17                  **a.    The "Truth About Splenda" Campaign**

18        As Andrew Briscoe, the head of the Sugar Association, candidly
19   admitted in an article in USA Today, "Sugar has an image problem – and we know
20   it."[10]  Indeed, a recent confluence of anti-sugar advocates, growth in low-carb and
21   low-sugar diets, bad weather conditions, and permissive import treaties have led to
22   growing concern within the industry of big problems for Big Sugar.[11]  The success
23   of Splenda, therefore, did not come as welcome news for the sugar industry, for
24   now there was a no-calorie sugar substitute on the market that, for the first time,

25   _____

26   [10] As the USA Today article notes, "[i]n the popular mind now, if sugar were a cowboy, it
     would wear a black hat."

27   [11] As McNeil will show at trial, the reference to "Big Sugar" is 100% accurate.  It is a $5
     billion industry in the United States, and plaintiffs alone sell nearly half of the sugar sold
28   in the U.S.

                                    **MCNEIL MEMO OF FACT AND LAW**
                                         **[CORRECTED VERSION]**
                                          CV 04-10077 DSF (RZX)

1  tasted like sugar, cooked and baked like sugar, and had a clean safety profile.  After

2  years of delay, the sugar industry eventually responded decisively to the Splenda

3  threat in the form of the "Truth About Splenda" campaign.  The main thrust of the

4  Truth About Splenda campaign is to tarnish the spotless safety record of Splenda to

5  convert Splenda users back to sugar, while also attacking McNeil's statements

6  "made from sugar" and "tastes like sugar" as false.

7         At least as early as 2003, the Sugar Association considered

8  undertaking a public relations campaign to tarnish the safety record of Splenda.  In

9  the spring of 2004, the Association revisited the possibility of an anti-Splenda

10  advertising and publicity campaign that would focus on the erroneous premise that

11  Splenda is an unsafe "chlorocarbon, a substance that has long been associated with

12  reproductive, genetic and organ damage and is commonly found in pesticides."

13  This campaign was rejected as "too negative," but a few months later, the Sugar

14  Association invited representatives from Qorvis Communications, a Washington,

15  D.C. public relations firm, to design a communications program targeted at the

16  safety of Splenda.

17         In mid-2004, Qorvis laid out its plan for the campaign at a meeting

18  with sugar industry representatives.  According to slides from that meeting, the

19  campaign's top-listed "Mission" was to "create substantial doubt in the public's

20  mind about the safety of Splenda."  Among the "Strategies" proposed were to

21  "creat[e] doubts about [Splenda] safety and long term effects," and to do so in a

22  "finger-print free" way through "third party advocates" so as to conceal the source

23  of the rumors.  Qorvis likened the strategy to arson:  "[s]tart a wildfire and then get

24  out of the way!"  Qorvis's anti-Splenda campaign was ultimately approved and

25  funded by the Sugar Association and its board members, including Counterclaim

26  Defendants American Sugar Refining, Imperial Sugar Company, and Rio Grande

27  Valley Sugar Growers.

28         In January 2005, Qorvis unleashed the so-called "Truth About

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1    Splenda" website, the centerpiece of the counterclaim defendants' anti-Splenda

2    campaign.  The website remains accessible on the internet today at

3    www.truthaboutsplenda.com.

4            The Truth About Splenda website's homepage depicts a pig-tailed,

5    bug-eyed girl starting at a plate of cookies and carries the headline "Do you know

6    what *your children* are eating?"  Embedded in the background of the homepage and

7    repeated several times is the word "Chlorine."  Consistent with Qorvis's promise of

8    launching its attack ads in a "finger-print free" way, when it was first launched, the

9    website did not disclose that it was sponsored by the Sugar Association and its

10   member companies.  The website includes a section entitled "Fact vs. Fiction" that

11   lists several statements regarding the makeup or safety of Splenda and pronounces

12   each of them a "FICTION."  Most, if not all, of these statements are knowingly

13   false and misleading:

14   *"FICTION:  Splenda is safe to eat, even for children."*

15           The claim on the Truth About Splenda website that it is a "FICTION"

16   to describe Splenda as "safe to eat, even for children" is demonstrably false.  Both

17   FDA and the international scientific community have found without reservation that

18   sucralose is safe to eat for all populations, including children.  Indeed, the Sugar

19   Association's own Executive Vice President and Chief Science Officer, Dr. Charles

20   Baker, has testified that it would be inappropriate to imply that Splenda is in any

21   way unsafe to eat.

22   *"FICTION:  Splenda has been thoroughly tested."*

23           The claim on the counterclaim defendants' website that Splenda has

24   not been thoroughly tested is similarly false.  To obtain FDA approval of sucralose,

25   McNeil submitted a 21,000-page application that included results from over 100

26   studies in animals and humans.  By any standard, this constitutes "thorough"

27   testing.  The statement on the website that many of these studies were sponsored by

28   McNeil does not render the statement "Splenda has been thoroughly tested" a

                                        - 30 -

1  "fiction." As Dr. Baker himself recognized, manufacturer-sponsored studies are the
2  norm in FDA applications.

3  *"FICTION: Products made with Splenda do not need warning labels."*

4      As counterclaim defendants have themselves conceded, "none of the
5  regulatory agencies or scientific review bodies that have confirmed the safety of
6  sucralose require any warning information to be placed on the labels of products
7  sweetened with sucralose." By definition, therefore, it is false to claim that
8  products sweetened with Splenda *do* need a warning label. Once again, Dr. Baker
9  is in agreement: he conceded at his deposition that he "would have to agree" that
10 the statement "[a]s written" is false.

11 *"FICTION:  The chlorine found in Splenda is similar to that found in other*
12 *foods we eat."*

13     Again, this statement is demonstrably untrue. The chlorine atoms
14 found in Splenda are not only "similar" to the ones present in other foods, they are
15 exactly the same. Chlorine is a naturally occurring element, and there is only one
16 "chlorine" on the periodic table. The fact that some chlorine atoms are held in
17 place by "ionic" bonds (to form "chlorides") while other are cemented by
18 "covalent" bonds does not make the atoms themselves any different from – let
19 alone not "similar" to – one another. And, even if the type of bond mattered (and it
20 does not), the "FICTION" statement would still be false because numerous
21 common foods, including peas, beans, and lentils, have chlorine atoms that are
22 covalently bound to the rest of the molecule – just like sucralose.

23 *"FICTION:  Splenda is natural sugar without calories."*

24     McNeil has never claimed that Splenda is sugar, much less "natural
25 sugar without calories." The implication of this untrue allegation is that McNeil
26 has attempted to mislead the public by stating that Splenda is sugar. This is
27 blatantly incorrect and deceptive.

28 *"FICTION:  Consumers have every reason to believe what they see and hear in*

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1    ***Splenda's advertisements.***"

2              This "fiction" wrongly implies that McNeil's advertising for Splenda

3    is false and misleading.  As McNeil will show at trial, counterclaim defendants are

4    incorrect:  McNeil's advertising for Splenda is truthful and not misleading to

5    consumers.

6              The "Fact vs. FICTION" section is not the only part of the website that

7    contains false or misleading statements about Splenda.  For example, the

8    "Frequently Asked QUESTIONS" part of the website includes the following

9    questions and answer:

10                   Is it safe for me to eat or drink a chlorinated product?

11                   In the case of Splenda, we simply don't know for certain what long-

12                   term consumption of this substance can do to people over their

13                   lifetimes. . . . The Food and Drug Administration (FDA) has reviewed

14                   possible side-effects from consuming Splenda, including enlarged liver

15                   and kidneys, decreased white blood cell count, reduced growth rate

16                   and decreased fetal body weight.

17   The counterclaim defendants make no mention of the fact that, after this "review,"

18   FDA concluded without equivocation that "sucralose ***may be safely used*** as a

19   sweetener."  These sorts of half-truths, innuendo, and intentional omissions are the

20   epitome of false advertising.

21              The counterclaim defendants' anti-Splenda publicity campaign has not

22   been limited to the Truth About Splenda website.  Rather, the campaign has

23   included a wide-ranging effort to plant false and misleading messages about

24   Splenda in all forms of media, often without any means of tracing the information

25   back to the sugar industry.  For example, Qorvis has arranged for anonymous

26   postings on various internet blogs, and has solicited or placed letters to the editor of

27   various publications, that appear to come from disinterested citizens.  In fact, these

28   communications have originated with Qorvis and have been designed to spread the

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1  false safety messages featured on the Truth About Splenda website.

2  In addition to attacking the safety of Splenda, the Truth About Splenda
3  campaign also seeks to discredit McNeil's advertising and marketing of Splenda.
4  Defendants have made numerous false and misleading statements of fact about the
5  safety of Splenda in connection with the Truth About Splenda campaign. The
6  TruthAboutSplenda.com homepage states, "Splenda's advertising claims that it is
7  'Made from Sugar, so it Tastes Like Sugar.' What they don't tell you is that
8  Splenda is not natural, it is chlorinated artificial sweetener." The website contains a
9  host of other knowingly false and intentionally misleading claims about Splenda
10 advertising, including, "Johnson & Johnson wants consumers to think that
11 [Splenda] is natural sugar without calories." This claim is false; neither Johnson &
12 Johnson nor McNeil has ever represented or implied that Splenda is a "natural"
13 product.

14  **3.    The Advertisements Actually Deceived a Substantial**
15        **Segment of Their Audience.**

16  If a claim is literally false (whether on its face or by necessary
17 implication), then the element of actual deception is deemed satisfied. *See William*
18 *H. Morris*, 66 F.3d at 258; *Century 21-RE/MAX*, 882 F. Supp. at 922. To establish
19 that a claim is "misleading," a party must show that the challenged statements
20 actually misled or deceived a significant portion the audience. *See William H.*
21 *Morris*, 66 F. 3d at 257-58; *Southland*, 108 F. 3d at 1140. Where, however, a party
22 acted with fraudulent intent of an egregious nature in making the challenged
23 statements, the jury may presume that consumers were in fact deceived. *See*
24 *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841-42 (9th Cir. 2002);
25 *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer*
26 *Pharms., Inc.*, 19 F.3d 125, 132 (3d Cir. 1994).

27  For the reasons already stated, the evidence will establish at trial that
28 the counterclaim defendants' advertising statements are literally false on their face

- 33 -

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   or, at a minimum, false by necessary implication. Splenda *is* safe to eat, including

2   for children. Splenda *has* been thoroughly tested. Products sweetened with

3   Splenda do *not* need warning labels. The chlorine found in Splenda *is* similar to (in

4   fact the same as) that found in other foods we eat. McNeil's advertising for

5   Splenda *is* truthful and not misleading to consumers. And McNeil *nowhere* states

6   (or implies) that Splenda is "natural sugar." Given that each of these statements is

7   literally false, actual deception must be presumed.

8               Moreover, at trial the jury will hear ample evidence that the

9   counterclaim defendants affirmatively intended to mislead consumers and that their

10  conduct in this regard was egregious under any standard. In approving the use of

11  sucralose, FDA considered more than 100 studies and concluded that the ingredient

12  was safe for all sweetening uses. Every other scientific and international regulatory

13  body to consider the safety of sucralose has similarly given the sweetener its stamp

14  of approval. Despite these determinations, the counterclaim defendants embarked

15  on a campaign to tarnish the clean bill of health of Splenda and thereby convert

16  Splenda users to sugar buyers. When they launched this campaign, the

17  counterclaim defendants did not have any new evidence that cast doubt on the

18  safety of Splenda, but rather they recycled the same tired arguments that had been

19  expressly considered – and rejected – by the scientific community when Splenda

20  was approved.[12] Indeed, despite the recognition by the counterclaim defendants'

21  own witnesses, such as Dr. Baker, that it would be inappropriate to imply that

22  ───────────

[12] In or about 2006, after the commencement of this litigation, the counterclaim
23  defendants hired two Duke University scientists to conduct a study regarding the effects
    of several different sweeteners, including sucralose, on rats. The purpose of this study
24  was apparently to justify the misrepresentations that the counterclaim defendants had been
    disseminating as part of the anti-Splenda campaign. McNeil has separately moved to
25  exclude any testimony about this study at trial because, among other reasons, the study's
    own investigators have now affirmatively disclaimed many of the findings and
26  conclusions expressed in their expert reports. Indeed, one of the report's authors
    conceded that the study was so full of errors and inconsistencies that it was little more
27  than a "slop job." But even if this study is allowed into evidence, McNeil will establish at
    trial that this single study – beset by its numerous methodological flaws and data reporting
28  errors – cannot possibly justify a finding that Splenda is in any way "unsafe."

1   Splenda is unsafe, the counterclaim defendants pursued a campaign designed to
2   communicate that very message.[13]  The counterclaim defendants' dishonesty was
3   intentional and it was egregious, and the jury should therefore presume that they
4   were ultimately successful in their deception.

5           **4.     The Counterclaim Defendants' Deception was**
6                   **Material**

7           McNeil will also establish that the counterclaim defendants' false
8   statements about Splenda are "material," in that they are "likely to influence the
9   purchasing decision" of consumers.  *Rice v. Fox Bread Co.*, 330 F. 3d 1170, 1181
10  (9th Cir. 2003).  This element requires little discussion, as there can be no doubt
11  that a consumer who is deceived into believing that Splenda is unsafe will be less
12  likely to purchase the product.  For example, the counterclaim defendants attempt
13  to capitalize on parents' concerns over the well-being of their children by branding
14  as a "fiction" the statement that "Splenda is safe to eat, ***even for children***."  The
15  intent – and result – of this deception is obvious:  to divert parents away from
16  Splenda out of fear that the sweetener will cause some (unnamed and unspecified)
17  harm to their children.

18          As discussed under the "injury" element below, the counterclaim
19  defendants have themselves recognized the materiality of their misstatements, as
20  they have evaluated the success of the anti-Splenda campaign by its impact on
21  Splenda sales.[14]  For all of these reasons, the materiality of the challenged
22  advertising is beyond serious dispute.

23

24  [13] An executive of one of the Sugar Association's member companies privately warned
    the head of the Association that they should avoid "attacking Splenda on the basis of the
25  chlorine" given the "ugly stuff" used in sugar processing, such as "sulfur dioxide, ABS
    and some bleach."  This warning to avoid misrepresenting the threat posed by the chlorine
26  in Splenda was obviously not heeded.

27  [14] One Qorvis representative has crowed that "the 'consumers are being misled' argument
    is not working" with the media, but that "[t]here is great interest or curiosity about the
28  health impacts."

**MCNEIL MEMO OF FACT AND LAW**
                                              **[CORRECTED VERSION]**
                                              CV 04-10077 DSF (RZX)

1          **5.     Interstate Commerce**

2          The parties have stipulated that this element has been met.

3          **6.     McNeil Has Been and Is Likely to be Injured as a**

4          **Result of the False Advertising**

5          The final element McNeil will establish at trial is that it "has been or is

6    likely to be injured as a result of the false advertisements." *Century 21-RE/MAX*,

7    882 F. Supp. at 924. This element will be satisfied both by candid admissions from

8    the counterclaim defendants' own files, as well as expert and lay witness testimony.

9          The Truth About Splenda campaign has succeeded in tarnishing the

10   reputation of Splenda. For example, in one of its many "progress reports" Qorvis

11   touted how in late 2004 – prior to the launch of the Campaign – Splenda media

12   coverage largely contained positive messages about the product, such as its "huge

13   popularity" and ease of use in many recipes. Just a few months later, after the

14   Campaign launch, the tide began to turn, with the media focused on negative

15   messages, such as concerns that "Splenda is similar to pesticides and eating too

16   much can cause organ damage." Similarly, Qorvis bragged that online buzz shifted

17   from only one website "talk[ing] about the true chemical nature of Splenda" to "8

18   of the top 10 hits on a Google search" now disparaging Splenda.

19         In a later progress report, Qorvis noted that by April 2005, it had

20   generated over 100 million media impressions about its anti-Splenda campaign with

21   over 80,000 unique visitors to the Truth About Splenda website by that time. By

22   the end of June 2005, the Campaign had been mentioned by countless national

23   media outlets, including NBC, ABC, CBS, FOX, CNN, The New York Times, and

24   The Washington Post, as well as various members of the local media. Just more

25   than a year later, in June 2006, Qorvis claimed that the Campaign had received over

26   130 million media impressions, across a range of media.

27         This anti-Splenda exposure had its intended effect of "[c]onvert[ing]"

28   Splenda users back to 'real all-natural sugar.'" For example, Qorvis has boasted

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1    that "As more and more Americans learn the 'Truth About Splenda' more and more
2    of them are saying no!," as "the tabletop use [of Splenda] has declined significantly,
3    by as much as 7-13% since the launch of the Truth About Splenda campaign."
4    Similarly, in a March 2005 email, Mr. Briscoe quipped that "there is a 7-13%
5    decrease in table top Splenda use . . . a positive sign that our Splenda legal/PR
6    initiative is starting to resonate with consumers."

7            Consistent with the counterclaim defendants' own claims, Philip
8    Green, one of the four founding principals of the consulting firm of Hoffman
9    Alvary & Company LLC, has submitted an expert report in this litigation in which
10   he opines that McNeil suffered up to $13.7 million in lost profits *in the First Half*
11   *of 2005 alone* as a result of the Truth About Splenda campaign. McNeil has
12   suffered further lost profits as a result of the counterclaim defendants' activities
13   subsequent to June 2005. In addition, McNeil has spent over $4 million on
14   corrective efforts in response to the counterclaim defendants' false advertising and
15   expects to spend upwards of another $5.4 million in corrective advertising by the
16   end of 2010. These financial outlays are in addition to the great reputational harm
17   McNeil has suffered as a result of the campaign that effectively depicts McNeil as
18   systematically duping the American public into ingesting a product that is harmful
19   to parents and children alike.

20           **7.    Plaintiffs' Ad Campaign Against Splenda Was Not**
21                  **Incidental to a Bona Fide Effort to Petition the**
22                  **Government**

23           McNeil will establish at trial that the Truth About Splenda campaign is
24   a commercial endeavor, rather than a political one, and therefore counterclaim
25   defendants are not immune from suit. McNeil will show that counterclaim
26   defendants launched the campaign to discourage the public from consuming
27   Splenda. The handful of references on the Truth About Splenda website to
28   petitioning the government do not turn the site as a whole into activity whose

                              - 37 -              **MCNEIL MEMO OF FACT AND LAW**

1   "essential character [is] political." *Allied Tube & Conduit Corp. v. Indian Head,*
2   *Inc.*, 486 U.S. 492, 505 (1988). As detailed above, the counterclaim defendants'
3   own internal documents and witness accounts bear this out. From the start, the
4   purpose of the campaign was to "create substantial doubt . . . about the safety of
5   Splenda" in order to "[c]onvert Splenda users back to 'real, all-natural sugar.'"
6   Representatives of Qorvis, the Sugar Association, and its member companies all
7   have acknowledged this commercial purpose under oath.

8         The Truth About Splenda site is maintained by a competitor (the sugar
9   industry) for the avowed purpose of disparaging Splenda and convincing consumers
10  to buy sugar instead. As such it is commercial advertising that not only falls within
11  the ambit of the Lanham Act, but is "the type of commercial activity that has
12  traditionally had its validity determined by" that statute. *Allied Tube*, 486 U.S. at
13  505.

14         **8.    Suggestions to "Send a Letter to the FDA" on**
15              **Plaintiffs' Website Are Not Bona Fide Petitioning but**
16              **Merely a Sham**

17         McNeil will also prove at trial that the Truth About Splenda
18  campaign's invitation for consumers to write to FDA is not genuinely aimed at
19  government action, but merely a sham to try to escape liability while engaging in
20  commercial activity against Splenda. As the Ninth Circuit has held, "neither the
21  Petition Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and
22  statutes need not be construed to permit them." *Sosa v. DirecTV, Inc.*, 437 F.3d
23  923, 932 (9th Cir. 2006).

24         The evidence at trial will overwhelmingly support a finding that the
25  counterclaim defendants had no genuine interest in effecting political change, but
26  rather made modest, disingenuous uses of governmental processes solely to inflict
27  competitive injury on McNeil. *See Sosa*, 437 F.3d at 938. With the possible
28  exception of a handful of statements on the website – which were likely included at

- 38 -

the behest of lawyers – the evidence points entirely to the conclusion that the Truth About Splenda campaign was designed for the exclusive purpose of diminishing the popularity of Splenda and thereby boosting sales of sugar.  The former CEO of one of the nation's largest sugar producers squarely admitted that the campaign "was not an attempt to get the government to do something about Splenda," but rather "an attempt to remedy the marketplace in favor of sugar."  Numerous documents reveal that the website's purpose was to "[c]onvert Splenda users back to 'real, all-natural sugar.'"  When evaluating the campaign's success, the barometer used by the counterclaim defendants was not the filing or progress of government petitions, but marketplace results.  For example, an email from Sugar Association President Andrew Briscoe stated that "there is a 7-13% decrease in table top Splenda use.  So we both feel this is a positive sign that our Splenda legal/PR initiative is starting to resonate with consumers."  Further evidence of the "sham" nature of the Truth About Splenda campaign is that none of the counterclaim defendants themselves – including their Washington, D.C. lobbyists at the Sugar Association – has ever filed an "FDA petition" of the sort that the website purports to encourage.

Furthermore, as McNeil will show at trial, the FDA petitions urged by counterclaim defendants are objectively baseless.  To the limited extent that the TAS website encourages governmental petitioning, it does so without scientific support and is objectively baseless.  No FDA "petition" of the sort urged on the website would have any chance to succeed, which undoubtedly explains why none of the counterclaim defendants have bothered to file one.  McNeil will show that "[n]o objective [person] could conclude that the [solicited letters to FDA] were reasonably calculated to elicit a favorable outcome." *Professional Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993).

Although the legal standard (discussed below) does not require McNeil to show that the individual statements on the Truth About Splenda website are "objectively baseless," McNeil will prove this at trial as well.  Each of the

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   challenged "Fictions" is predicated on patent junk science, or on sleight of hand.

2        First, the website falsely implies that McNeil advertises that "Splenda
3   is natural sugar without calories." McNeil has never made this claim.

4        Next, the website labels as "Fiction" the statement that "Splenda is
5   safe to eat, even for children." The supposed "support" for this assertion is that
6   there are "no 'conclusive' and 'long-term human studies'" that prove that Splenda
7   is safe. But "fiction" does not mean "unproven" – it means "feigned, invented or
8   imagined." FDA has unequivocally found Splenda to be safe. McNeil will
9   therefore prove that it is objectively baseless to call the statement "Splenda is safe
10  to eat" a "fiction."

11       Third, the website announces that the statement "Splenda has been
12  thoroughly tested" is yet another "Fiction." As McNeil will show at trial, McNeil
13  submitted more than 100 studies in animals and humans, and FDA deemed those
14  studies sufficient to demonstrate that there are no safety issues associated with the
15  ingestion of sucralose. And the website's "Fact" assertion that "these human tests
16  were all conducted by the manufacturer of Splenda" hardly disproves the
17  proposition that "Splenda has been thoroughly tested."

18       Fourth, the website says it is "Fiction" that "The chlorine in Splenda is
19  similar to that found in other foods we eat." The only "Fact[s]" offered in support
20  of this contention are as follows: "The manufacturer of Splenda claims that
21  chlorine is naturally present in such foods as lettuce, mushrooms and table salt, but
22  they never directly state that eating Splenda is the same as eating these foods."
23  This is obvious double talk. As McNeil will prove at trial, the chlorine atoms
24  present on the sucralose molecule are the same as the chlorine atoms found in, e.g.,
25  table salt (NaCl). As Plaintiffs' expert Susan Schiffman put it, there is only one
26  chlorine atom in the periodic table of elements. The way that this single chlorine
27  atom is connected to other atoms (*i.e.*, whether held in place by "ionic" bonds or
28  cemented by "covalent" bonds) doesn't make the atom any different – let alone not

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1    "similar."

2           Fifth, the website proclaims that the statement "Products made with

3    Splenda do not need warning labels" is a "Fiction." McNeil will show that FDA

4    has evaluated the safety of Splenda on multiple occasions and has deemed it safe

5    for use without any warning labels. The counterclaim defendants' argument – that

6    "consumers have a right to know exactly what is in their foods" – does not come

7    close to providing an objectively reasonable basis to claim that Splenda "needs" a

8    "warning label." Counterclaim defendants have effectively conceded as much.

9           Finally, the website also states that the statement "consumers have

10   every reason to believe what they see and hear in Splenda's advertisements," is a

11   fiction, falsely implying that McNeil's advertisements are untrue. As McNeil will

12   show at trial, McNeil's advertising for Splenda is truthful and not misleading to

13   consumers, and McNeil has never described Splenda as "natural sugar."

14          The evidence and testimony at trial will prove that the counterclaim

15   defendants' *Noerr-Pennington* defense cannot save them from liability.

16          **9.    McNeil's Alleged Unclean Hands**

17          Plaintiffs contend that, for all the same reasons that McNeil's

18   advertising is allegedly false and misleading, McNeil should be precluded from

19   recovering on its counterclaims under the doctrine of unclean hands. Just as

20   McNeil disputes plaintiffs' affirmative claims of false advertising, McNeil disputes

21   counterclaim defendants' allegations of unclean hands. Moreover, as discussed

22   below in Part B(1)(a), even if plaintiffs are ultimately successful in proving their

23   claims against McNeil, McNeil's alleged misconduct in promoting Splenda is not

24   sufficiently related to counterclaim defendants' blatantly false "The Truth About

25   Splenda" smear campaign for the doctrine of unclean hands to bar McNeil's

26   counterclaims.

27          **10.    McNeil's Alleged Waiver**

28          Although counterclaim defendants apparently intend to rely on the

- 41 -