1   defense of waiver, there are simply no facts that support the contention that McNeil
2   relinquished any of its existing rights with respect to the Truth About Splenda
3   campaign; indeed, the plaintiffs fail to point to any.  McNeil filed its counterclaims
4   only a few short months after the campaign was launched and as such cannot be
5   said to have waived any of their claims.  And even if counterclaim defendants were
6   able to show (by clear and convincing evidence) that McNeil voluntarily,
7   knowingly and intentionally relinquished its legal rights, *and* that counterclaim
8   defendants were prejudiced as a result, the doctrine of waiver would not serve as a
9   complete bar to McNeil's Unfair Competition Law causes of action.  *See Cortez v.*
10  *Purolator Air Filtration Products Co.*, 23 Cal 4 163, 179 (2000) ("We agree that
11  equitable defenses may not be asserted to wholly defeat a UCL claim . . .").

12  **IV.   CONTENTIONS OF LAW**

13        **A.   Issues to Be Resolved by the Court and the Jury**

14             The parties have a right to a jury trial on the legal claims asserted in
15  their respective cases.  U.S. CONST. amend. VII; FED. R. CIV. P. 38(a).  Both
16  parties made timely demands for a jury trial.  No right to a jury trial exists,
17  however, for the equitable affirmative defenses asserted in this case.  *See, e.g.,*
18  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) ("no right to a jury
19  exists for equitable claims"); *Granite State Ins. Co. v. Smart Modular*
20  *Technologies, Inc.*, 76 F.3d 1023, 1027 (9th Cir. 1996) ("A litigant is not entitled to
21  have a jury resolve a disputed affirmative defense if the defense is equitable in
22  nature"); *Dollar Sys., Inc. v. Avcar Leasing Sys. Inc.*, 890 F.2d 165, 170 (9th Cir.
23  1989) ("no right to a jury exists" for equitable claims).

24             Accordingly, the parties agree those affirmative defenses should be
25  decided by the Court rather than a jury.  Specifically, the Court should decide:

26        **1.   McNeil's affirmative defense of laches.**

27             *See Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534
28             (1956) (Laches "is a question primarily addressed to the

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
CV 04-10077 DSF (RZX)

1    discretion of the trial court."); *see also Danjaq LLC v. Sony*

2    *Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) ("there is no right to a

3    jury on the equitable defense of laches").[15]

4    **2.**   **McNeil's and Counterclaim Defendants' affirmative**

5    **defenses of unclean hands.**

6    *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360

7    *(1995) (unclean hands is an equitable defense, originating in the*

8    *courts of equity); California v. Am. Stores Co.*, 495 U.S. 271,

9    *295 (1990) (unclean hands is an equitable doctrine); Rivera v.*

10   *Nibco, Inc.*, 364 F.3d 1057, 1071 (9th Cir. 2004) (same); *Levi*

11   *Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997

12   *(same); Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76

13   F.3d 1023, 1027 (9th Cir. 1996) ("A litigant is not entitled to

14   have a jury resolve a disputed affirmative defense if the defense

15   is equitable in nature").[16]

16   Similarly, it is appropriate for the Court rather than a jury to rule on

17   the equitable remedies requested in this case.  Specifically, McNeil contends that

18   the Court should decide whether the party requesting each of the following

19   remedies is entitled to receive it:

20   [15] *See also Mile High Indus. v. Cohen*, 222 F.3d 845, 857 (10th Cir. 2000) (striking jury

21   demand for laches defense to foreclosure action); *McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F. Supp. 2d 595, 618-619 (E.D.N.C. 2006) (because "laches is an

22   equitable defense that the court, not a jury, decides," court held an evidentiary hearing on laches before the jury trial); *Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc.*, 219

23   F.R.D. 135, 150 (N.D. Iowa 2003) (court to hear evidence on equitable defenses in proceedings outside the presence of the jury on trial days or after the trial concluded);

24   *Compaq Computer Corp. v. Ergonome, Inc.*, 196 F. Supp. 2d 471, 475 (S.D. Tex. 2002) (defense of laches lies in equity and is triable to the court and not a jury); *Cayuga Indian*

25   *Nation v. Pataki*, 79 F. Supp. 2d 78, 92 (N.D.N.Y. 1999) (denying motion to present evidence on the issue of laches to the jury and reserving the issue to the court); *Schering*

26   *Corp. v. Amgen Inc.*, 969 F. Supp. 258, 269 (D. Del. 1997) (testimony regarding laches to be heard by the court, not a jury).

27   [16] *See also, e.g., Gidatex, S.r.L. v. Campaniello Imps., Ltd.*, 82 F. Supp. 2d 126, 132

28   (S.D.N.Y. 1999) (legal claims went to jury and equitable affirmative defenses – including unclean hands – were tried to the judge).

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
CV 04-10077 DSF (RZX)

### 1.   Injunction

There is no right to trial by jury of an equitable claim for injunctive relief. *See, e.g., City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 719 (1999) ("It is settled law that the Seventh Amendment does not apply in" suits seeking injunctive relief).

### 2.   Attorneys' Fees and Enhanced Damages

The Lanham Act specifies that the decisions whether to increase a damages award and whether to award attorneys' fees are for the court rather than a jury. *See* 15 U.S.C. § 1117 ("If *the court* shall find that the amount of the recovery based on profits is either inadequate or excessive *the court* may in its discretion enter judgment for such sum as *the court* shall find to be just, according to the circumstances of the case . . . *The court* in exceptional cases may award reasonable attorney fees to the prevailing party.") (emphasis added).

### 3.   Disgorgement/Accounting of Profits

An accounting of profits under the Lanham Act is an equitable remedy. *See, e.g., Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.*, 970 F.2d 552, 559 (9th Cir. 1992) ("An accounting of profits under [the Lanham Act] §1117(a) is not synonymous with an award of monetary damages: '[a]n accounting for profits ... is an equitable remedy subject to the principles of equity.'") (quoting *Fuller Brush Products Co. v. Fuller Brush Company*, 299 F.2d 772, 777 (7th Cir.), *cert. denied*, 370 U.S. 923 (1962).

For this reason, it is more appropriate for the Court than a jury to determine whether an accounting of profits award is appropriate. *See, e.g. Playboy Enterprises, Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1275 (9th Cir. 1982) (holding in a Lanham Act case that "any decision concerning the awarding of an accounting of profits remedy should remain within the discretion of the trial court"); *Oyster Software, Inc. v. Forms Processing, Inc.*, No. C-00-0724, 2001 WL 1736382, at *3 n.5 (N.D. Cal. Dec. 6, 2001) (noting in the context of a summary

- 44 -

1  judgment motion on the issue of accounting of defendant's profits under the

2  Lanham Act that "it is the Court, and not the jury, that will make the ultimate

3  determination as to whether or not an accounting is appropriate and the scope of

4  any accounting that may be ordered"); *Castrol, Inc. v. Pennzoil Quaker State Co.*,

5  169 F. Supp. 2d 332, 344 (D.N.J. 2001) (holding that the argument that a defendant

6  from whom disgorgement is sought under the Lanham Act is entitled to a jury trial

7  on the issue is "legally erroneous" because "[a] plain reading of the Lanham Act

8  remedy section unqualifiedly weighs against [defendants'] interpretation that they

9  are entitled to a jury trial on the disgorgement of profits issue . . . the language of

10  this section makes no mention of a trial by jury").

### 3. McNeil's claims under the California Business and Professions Code

13  Finally, the Court rather than a jury should decide McNeil's claims

14  under sections 17200 and 17500 of the California Business and Professions Code.

15  The UCL and FAL provide only for equitable remedies, and there is no right to jury

16  trial in either a section 17200 or 17500 suit. *See, e.g., Hodge v. Superior Court*,

17  145 Cal. App. 4 278, 281, 51 Cal. Rptr. 3d 519, 521 (Cal. App. 2 Dist. 2006). *See*

18  *also Okura & Co. (America), Inc. v. Careau Group*, 783 F. Supp. 482, 490 n.1

19  (C.D. Cal. 1991).

### B. Key Legal Issues Germane to the Case

#### 1. Equitable Defenses

##### a. Laches

23  "It is well established that laches is a valid defense to Lanham Act

24  claims for both monetary damages and injunctive relief." *Miller v. Glenn Miller*

25  *Prods.*, 318 F. Supp. 2d 923, 941 (C.D. Cal. 2004), *aff'd and adopted*, *Miller*, 454

26  F.3d 975 (9th Cir. 2006); *see also Jarrow*, 304 F.3d at 840. The facts adduced at

27  trial will establish that plaintiffs delayed unreasonably in bringing this suit and that

28  McNeil has been prejudiced as a result of plaintiffs' delay. *See Tillamook Country*

*Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102, 1108 (9th Cir. 2006). Plaintiffs' claims accordingly are barred in their entirety.

**Delay:**  For purposes of laches, the clock runs from the point in time when plaintiffs knew, or should have known, of the conduct that they are seeking to challenge. *See Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001). The Sugar Association and plaintiff-interveners knew of the potential threat from Splenda advertising at the latest within weeks of the product's retail launch in late 2000. Moreover, at that time the plaintiffs knew that (a) sucralose is an artificial sweetener produced by modifying the sucrose molecule and (b) sucralose is not a "natural" product. Yet they waited over four and five years, respectively, before challenging McNeil's ubiquitous "made from sugar, tastes like sugar" advertising. Such prolonged inaction qualifies as "unreasonable delay." *See, e.g., Grupo Gigante SA de CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1102-03 (9th Cir. 2004) (four year delay); *McCune v. F. Alioto Fish Co.*, 597 F.2d 1244, 1250 (9th Cir. 1979) ("over three years" delay).

**Presumption of Laches:**  In the Ninth Circuit, "if a § 43(a) claim is filed within the analogous state limitations period, the strong presumption is that laches is inapplicable; if the claim is filed after the analogous limitations period has expired, the presumption is that laches is a bar to suit." *Jarrow*, 304 F.3d at 837. That "presumption of laches is triggered" if "any part of the claimed wrongful conduct occurred beyond the limitations period." *Id.* Because the analogous limitations period for plaintiffs' false advertising claims is three years, *id.* at 838, plaintiffs' claims are presumptively barred by their delay.

**Progressive Encroachment:**  Plaintiffs' various "post hoc" rationalizations for their inaction cannot justify their delay. *See Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823 (7th Cir. 1999) (rejecting plaintiff's "post hoc rationalization for [its] unreasonable delay"). In particular, because McNeil has always been a competitive threat to sugar, plaintiffs' delay cannot be excused on a

- 46 -

1    theory of "progressive encroachment." *See Tillamook Country Smoker,* 465 F.3d at

2    1110. Progressive encroachment, which is recognized in trademark cases, permits a

3    trademark owner some leeway in electing not to sue "in the face of *de minimis*

4    infringement." *Id.*

5           The threat to sugar posed by Splenda, however, has never been *de*

6    *minimis.* Nor has McNeil "expanded its business into different regions or into

7    different markets" such that plaintiffs' failure to take notice sooner could be

8    excused. *Id.* (quoting *Grupo Gigante.,* 391 F.3d at 1103). Nor have any changes in

9    McNeil's business or advertising over the years constituted changes "of kind" as

10   opposed to mere changes of "degree." *Tillamook Country Smoker, Inc. v.*

11   *Tillamook County Creamery Ass'n,* 311 F. Supp.2d 1023 1034-35 (D. Or. 2004),

12   *aff'd,* 465 F.3d 1102 (9th Cir. 2006); *see also Prudential Ins. Co. v. Gibraltar Fin.*

13   *Corp.,* 694 F.2d 1150, 1154 (9th Cir. 1982) ("growth alone does not infringement

14   make"). Indeed, McNeil's advertising has always included the phrases "made from

15   sugar, tastes like sugar," and "made from sugar so it tastes like sugar" about which

16   plaintiffs complain. Progressive encroachment thus has no application on the facts

17   of this case.

18          **Prejudice:**  The Ninth Circuit has held that "prejudice" exists when,

19   during the time plaintiffs slept on their rights, an advertiser made the claims that are

20   being challenged "a significant part" of its marketing campaign; "prominently"

21   displayed the claims on the product's label; invested "hundreds of thousands of

22   dollars per year" in advertisements; or expended "enormous resources" in "tying"

23   the product's identity to the challenged claims. *Jarrow Formulas v. Nutrition Now,*

24   304 F.3d 829, 839-40 (9th Cir. 2002) (citing *Hot Wax,* 191 F.3d at 813); *see also*

25   *Tillamook Country Smoker,* 311 F. Supp.2d at 1038 ("economic prejudice is

26   apparent" when defendant "has spent millions of dollars" to "create a favorable

27   image" for its products).

28          In numerous ways, McNeil stands to lose more today than if plaintiffs

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   had sued earlier, which suffices to show that McNeil has been prejudiced. *See*

2   *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001) (recognizing

3   defendants may establish "economic prejudice" in various ways but "one form of

4   prejudice is continuing to make investments" in connection with "the operation of

5   [a] business"). But McNeil has also been prejudiced because it has heavily invested

6   in a brand positioning for Splenda to the exclusion of other possible marketing

7   campaigns, *see Jarrow*, 304 F.3d at 839 (advertiser is prejudiced if it "could have

8   invested its resources in shaping an alternative" brand identity had plaintiffs sued

9   promptly), *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996)

10   (finding prejudice where defendant had "committed massive resources to best

11   exploit a marketing strategy it chose a half dozen years ago"), and potentially faces

12   a vastly higher damages claim as a result of the plaintiffs' delay. *See, e.g, Nartron*

13   *Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 411 (6th Cir. 2002) (holding that

14   "any prejudice is sufficient [for laches], including an increase in potential

15   damages"); *Chiron Corp. v. Genentech, Inc.*, 268 F. Supp. 2d 1139, 1146 (E.D. Cal.

16   2002).

17            **Unclean Hands:** Plaintiffs contend that McNeil is precluded from

18   asserting a laches defense because of its unclean hands. But the Ninth Circuit has

19   cautioned that in "a Lanham Act false advertising suit, a plaintiff cannot ordinarily

20   show unclean hands, and thereby defeat laches, simply by alleging that the

21   defendant made claims knowing that they were false." *Jarrow*, 304 F.3d at 841.

22   Indeed, to "conclude otherwise would be effectively to preclude the application of

23   laches whenever a dispute of fact regarding the merits of a Lanham Act claim

24   existed because conceivably all suits involving Lanham Act claims could involve

25   accusations of fraudulent or deceptive conduct." *Id.* at 841-42 (quoting *Hot Wax*,

26   191 F.3d at 826).

27            Rather, a "plaintiff can escape laches under the unclean hands doctrine

28   only if the court is left with a ***firm conviction*** that the defendant acted with a

- 48 -

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1  *fraudulent* intent in making the challenged claims." *Id.* at 842 (emphasis added).

2  Accordingly, courts have said that only deliberate conduct of an egregious nature –

3  as measured against industry norms – will be sufficient to preclude laches. *See,*

4  *e.g., Hot Wax*, 191 F.3d at 826 (rejecting claim of egregiousness in light of

5  "evidence of industry and consumer expectations"); *Rorer*, 19 F.3d at 132 (rejecting

6  similar claim where evidence "show[ed] an intent to mislead, or to create a

7  misleading halo effect, of a kind that is unfortunately common in the industry").

8        Moreover, even assuming McNeil's advertising could be considered

9  deliberately fraudulent and egregious, plaintiffs' laches would only be excused with

10 respect to their request for injunctive relief. *See Hanover Star Milling Co. v.*

11 *Metcalf*, 240 U.S. 403, 419 (1916) ("As to laches . . . , it has been repeatedly held,

12 in cases where defendants acted fraudulently . . . , that relief by injunction would be

13 accorded although an accounting of profits should be denied."). Plaintiff-

14 interveners' claims for monetary damages are therefore barred regardless of

15 McNeil's alleged "unclean hands." *Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d 209,

16 212 (4th Cir. 1982) (recognizing that "laches as a defense to claims for injunctive

17 relief may be limited" by a defendant's "bad faith," but laches will still "bar a claim

18 for damages").

19       **Public Interest:** Plaintiffs' contention that the "public interest" in

20 truthful advertising should trump McNeil's laches defense also finds no support in

21 the law. In fact, the Ninth Circuit has instructed that:

22       [a court] must be careful not to define the public's interest in such a

23       manner as to effectively swallow the rule of laches, and render it a

24       spineless defense. For example, the public surely has some interest in

25       ensuring that all product advertisements are materially accurate.

26       However, if a plaintiff could defeat laches simply by asserting the

27       public's interest in accurate advertising, laches would in effect not be a

28       defense to Lanham Act false advertising claims.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   *Jarrow*, 304 F.3d at 840-41.  For that reason, the  "public's interest will trump

2   laches *only* when" the party invoking the public's interest demonstrates that "the

3   product is harmful or otherwise a threat to public safety and well being."  *Id.*

4   (emphasis added).

5         Plaintiffs have not alleged, and certainly cannot prove, that Splenda is a

6   threat to public safety.  At most, plaintiffs contend only that Splenda is not as

7   healthful as it is portrayed in McNeil's advertising.  There accordingly is no public

8   interest at stake in this case that could excuse the plaintiffs' laches.

9                       **b.     Unclean Hands**

10        "The unclean hands doctrine closes the doors of a court of equity to

11  one tainted with inequitableness or bad faith relative to the matter in which he seeks

12  relief."  *Jarrow,* 304 F.3d at 841 (internal quotations omitted).  The doctrine is a

13  defense to Lanham Act suits.  *See, e.g., Fuddruckers, Inc. v. Doc's B.R. Others,*

14  *Inc.*, 826 F.2d 837, 847 (9th Cir. 1987).

15        At trial, McNeil will establish that the plaintiffs have engaged in

16  fraudulent conduct of an egregious nature with respect to the same subject matter as

17  their claims.  *See Jarrow*, 304 F.3d at 842; *Dollar Sys., Inc. v. Avcar Leasing Sys.,*

18  *Inc.*, 890 F.2d 165, 173 (9th Cir. 1989).  Through the Truth About Splenda

19  publicity campaign, plaintiffs have maliciously pursued a vicious attack campaign

20  designed to smear the safety record of Splenda.  Under the law of this Circuit, this

21  conduct constitutes "unclean hands" and closes the doors of equity to their Lanham

22  Act claims.

23        The evidence will show that the counterclaim defendants' own unclean

24  hands defense to McNeil's counterclaims is nothing more than a last-ditch attempt

25  to avoid the consequences of their wrongful actions.  At trial, McNeil will establish

26  that the counterclaim defendants cannot avoid liability for their smear campaign by

27  claiming that McNeil acted inequitably when it truthfully informed consumers that

28  Splenda is "made from sugar" and "tastes like sugar."  Nor can the counterclaim

1   defendants defend themselves by (incorrectly) arguing that McNeil "lied" to the

2   Merisant Company, a third party competitor, when McNeil denied Merisant's

3   allegations that its ads were misleading in a private exchange of correspondence.

4   **Inequitable conduct:** In order to establish an unclean hands defense,

5   a party must show by "clear and convincing evidence" that the claimant has

6   engaged in inequitable conduct. *Pfizer, Inc. v. Int'l Rectifier Corp.*, 685 F.2d 357,

7   359 (9th Cir. 1982); *see also Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383

8   F.3d 110, 129 (3d Cir. 2004). A mere showing that a party "made claims knowing

9   that they were false" does not constitute inequitable conduct sufficient for unclean

10  hands. *Jarrow*, 304 F.3d at 841. Rather, to establish the equitable defense, the

11  party asserting unclean hands must demonstrate that its adversary acted with

12  "fraudulent intent," *id.* at 842, of an "egregious" nature, *Citizens*, 383 F.3d at 129.

13  To determine whether a party's conduct is "egregious," the Court

14  should consider "evidence of industry and consumer expectations." *Hot Wax, Inc.*

15  *v. Turtle Wax, Inc.*, 191 F.3d 813, 826 (7th Cir. 1999) (holding that advertiser did

16  not engage in "willful fraud" sufficient to establish unclean hands in light of

17  industry standards); *see also Johnson & Johnson-Merck Consumer Pharms. Co. v.*

18  *Rhone-Poulenc Rorer Pharms, Inc.*, 19 F.3d 125, 132 (3d Cir. 1994) (holding that

19  defendants had not engaged in "deliberate conduct of an egregious nature" given

20  that "evidence only shows an intent to mislead, or to create a misleading halo

21  effect, of a kind that is unfortunately common in the antacid industry"); *Procter &*

22  *Gamble Pharms., Inc. v. Hoffmann-La Roche, Inc.*, No. 06 Civ. 0034, 2006 WL

23  2588002, at *29 (S.D.N.Y. Sept. 6, 2006) (holding that defendant's claims were not

24  "egregious" given that "they do not appear to be atypical of conduct in a

25  competitive marketplace").

26  The evidence at trial will leave no doubt that plaintiffs have engaged in

27  conduct that is both fraudulent and egregious. The Truth About Splenda campaign

28  is a prototypical smear campaign whose express purpose is to frighten consumers

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

away from Splenda by purposefully disseminating misinformation about its safety.
As the counterclaim defendants' internal documents reveal, the number one mission
of the campaign was "to create substantial doubt in the public's mind about the
safety of Splenda."  This objective was identified despite the fact that plaintiffs had
no legitimate basis to doubt the conclusions of FDA and other world health
organizations that "sucralose may be safely used as a sweetener."

The counterclaim defendants' makeshift unclean hands defense is
quite another story.  The counterclaim defendants allege that McNeil may not
pursue its counterclaim because, allegedly, McNeil intended to mislead consumers
through the "made from sugar, tastes like sugar" advertising campaign.  As
discussed above, the evidence at trial will show otherwise.  McNeil has never
intended to deceive consumers into believing that Splenda is a natural, no-calorie
sugar and has taken numerous measures to ensure that consumers understand what
the product is – and what it is not.  Consumer research confirms that, in the end,
consumers well understand that Splenda is an artificial sweetener that is made from
sugar and tastes like sugar, but does not actually contain sugar.  As such, McNeil's
conduct was neither "fraudulent" nor "egregious."

**Nexus:**  It is well-settled that "misconduct in the abstract, unrelated to
the claim to which it is asserted as a defense, does not constitute unclean hands."
*Republic Molding Corp. v. B.W. Photo Util.*, 319 F.2d 347, 349 (9th Cir. 1963).
Instead, "[w]hat is material is not that the plaintiff's hands are dirty, but that he
dirtied them in acquiring the right he now asserts, or that the manner of dirtying
renders inequitable the assertion of such rights against the defendant." *Id.*
Accordingly, "[i]t is fundamental to the operation of the doctrine that the alleged
misconduct by the plaintiff relate directly to the transaction concerning which the
complaint is made." *Dollar Sys.*, 890 F.2d at 173; *see also Washington Capital
Basketball Club v. Barry*, 419 F.2d 472, 478 (9th Cir. 1969) ("[T]he bad conduct

1  must pertain to the subject matter involved and affect the equitable relations
2  between the litigants.").

3    In this case, plaintiffs filed an action to contest McNeil's advertising in
4  December 2004, and then immediately turned around and used their lawsuit as a
5  phony excuse to launch the "Truth About Splenda" smear campaign in January
6  2005.  Rather than simply report on their allegations of false advertising, the thrust
7  of the plaintiffs' website and related public relations campaign has been to tarnish
8  the safety record of Splenda without any scientific basis to do so.  Plaintiffs' only
9  excuse for this unconscionable behavior has been to season their website with a few
10  references to this lawsuit and to argue – in sham fashion – that the Truth About
11  Splenda campaign is "attendant publicity" for this action and a bona fide attempt to
12  petition the government for grievances.  It would be inequitable to permit these
13  plaintiffs, who have treated the pendency of this proceeding as an invitation to lie to
14  consumers and compete unfairly against McNeil, to obtain the assistance of a court
15  of equity in combating McNeil's alleged false advertising.  Accordingly, plaintiffs'
16  claims should be barred by unclean hands. *Republic Molding*, 319 F.2d at 349
17  (holding that unclean hands doctrine bars a plaintiff from seeking equitable relief
18  where the "manner of dirtying renders inequitable the assertion of such rights
19  against the defendant").

20    Conversely, the requisite nexus between the supposed inequitable
21  conduct of McNeil (which involves alleged deception of consumers through the
22  truthful claims that Splenda is "made from sugar" and "tastes like sugar"), and
23  McNeil's counterclaim (which is focused on the counterclaim defendants' false
24  assertions that impugn the *safety* of Splenda), is absent.  Even if it were true that
25  McNeil deliberately set out to confuse consumers, that in no way would justify the
26  baseless smear campaign that the counterclaim defendants have undertaken, nor
27  would it provide a basis to deny McNeil the assistance of this Court in putting a
28  stop to their unlawful conduct. *See Kelley Blue Book v. Car-Smarts, Inc.*, 802 F.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

Supp. 278, 292 (C.D. Cal. 1992) ("It has been held that it is only when the plaintiff's improper conduct is the source, or part of the source of his equitable claim, that he is to be barred because of this conduct.").

Similarly, the "unclean hands" incident on which plaintiffs rely to justify their delay in filing suit – a supposed "misrepresentation" by McNeil in private correspondence with another competitor, the Merisant Company, in response to Merisant's complaints about McNeil's advertising – cannot support the counterclaim defendants' unclean hands defense. In that exchange, McNeil merely expressed its disagreement with Merisant's assertion that McNeil's ads might inadvertently have confused consumers. Such a statement to a third party, which was unseen by and unknown to these plaintiffs prior to the commencement of this action, plainly lacks any "nexus" to this case. *See, e.g., Washington Capitol Basketball Club*, 419 F.2d at 478 (holding that "the bad conduct must . . . affect the ***equitable relations between the litigants***") (emphasis added).

**UCL Claim:**  In addition to its Lanham Act claim, McNeil has also asserted a counterclaim relating to the Truth About Splenda campaign under California's Unfair Competition Law.  Unlike Lanham Act claims, "equitable defenses [like unclean hands] may not be asserted to wholly defeat a UCL claim," but rather may only "guide the court's discretion in fashioning the equitable remedies." *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 179 (Cal. 2000).  For the reasons already discussed, the evidence at trial will show that McNeil has not acted inequitably with respect to the subject of its counterclaim and that McNeil is entitled to full relief under the Unfair Competition Law.

### 4.    Noerr-Pennington Defense

Counterclaim defendants contend that McNeil's counterclaims are barred because the Truth About Splenda campaign is protected by the *Noerr-Pennington* doctrine.  Where the *Noerr-Pennington* doctrine applies, a party who petitions the government for redress of grievances cannot be found liable for its

1    petitioning activity.  However, if the "petitioning" activity in question is merely a

2    "sham" designed to conceal what is really an effort to injure a competitor or stifle

3    competition, then the party may be found liable for its actions.

4                    a.     **Legal Standard to Determine Whether**

5                           **Counterclaim Defendants are Engaged in Bona**

6                           **Fide Petitioning**

7               The U.S. Supreme Court has instructed that the question whether

8    Noerr-Pennington immunity applies to a particular pattern of conduct "depends on

9    the context and nature of the activity." *Allied Tube*, 486 U.S. at 507 n.10 & 505-

10   507.  Where the facts alleged to support liability are "a classic attempt . . . to

11   influence legislation by a campaign of publicity,'" such that its "essential character

12   [is] political," the activity is protected (provided it is not a sham).  *Id*. at 505

13   (quoting *Noerr*, 365 U.S. at 143).  But where "the context and nature of the []

14   activity make it the type of commercial activity that has traditionally had its validity

15   determined by" the applicable statute, there is no immunity under *Noerr*.  *Id*. at

16   505; *see also id*. at 507 (courts "should not immunize what are in essence

17   commercial activities simply because they have a political impact").

18               To constitute bona fide political activity for the *Noerr-Pennington*

19   doctrine to apply, the conduct at issue must be essentially political, as opposed to

20   commercial, in nature.  *Id*. at 507.  If the jury finds that the counterclaim

21   defendants' statements were fundamentally commercial activity designed to harm

22   McNeil, the counterclaim defendants affirmative defense under the *Noerr-*

23   *Pennington* doctrine must be rejected.  *Id*. at 505.   In light of the proof that McNeil

24   will adduce at trial, it is apparent that the "essential character of the [Truth About

25   Splenda] campaign" is ***not*** "political," but rather "can more aptly be characterized

26   as ***commercial*** activity" – albeit with some, *de minimis* potential for "political

27   impact."  *Allied Tube & Conduit Corp. v. Indian Head, Inc*., 486 U.S. 492, 507

28   (1988) (emphasis added).

1        The handful of references on the Truth About Splenda website to
2   petitioning the government do not turn the site as a whole into activity whose
3   essential character is political.  As detailed above, the counterclaim defendants'
4   overt purpose in creating the campaign was to "create substantial doubt . . . about
5   the safety of Splenda" to "[c]onvert Splenda users back to 'real, all-natural sugar.'"
6   Where, as here, the conduct in question is fundamentally commercial (not political)
7   in nature, such that it is "the type of activity that has traditionally had its validity
8   determined by" the statute in question (the Lanham Act), *Noerr-Pennington*
9   immunity does not attach.  *See Allied Tube*, 486 U.S. at 507 (refusing to apply
10  immunity where "the activity at issue . . . cannot, as in Noerr, be characterized as an
11  activity that has traditionally been regulated with extreme caution, or as an activity
12  that bear[s] little resemblance to [statements] normally held violative of the
13  [Lanham] Act") (internal quotations and citations omitted).

14        This conclusion is supported by the fact that the Lanham Act itself
15  strikes a balance between the protections afforded to truthful commercial
16  communications and the need to prohibit false or misleading representations of a
17  commercial nature.  The former are entitled to First Amendment protection, while
18  the latter are not.  *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
19  447 U.S. 557, 563 (1980) ("there can be no constitutional objection to the
20  suppression of commercial messages that do not accurately inform the public about
21  lawful activity"); *Porous Media Corp. v. Pall Corp.*, 173 F.3d 1109, 1119 (8th Cir.
22  1999) (rejecting argument that Lanham Act liability for false advertising must be
23  tempered by the First Amendment); *see also Titan Sports, Inc. v. 3-G Productions*,
24  No. CV 90-3022, 1991 WL 228716, at *2 (C.D. Cal. July 31, 1991) ("misleading
25  commercial speech regulated by the Lanham Act is beyond the protective reach of
26  the First Amendment").  Because the Lanham Act on its face is confined to false or
27  misleading "commercial advertising or promotion" and does not reach *bona fide*
28  attempts to petition the government, there is no conflict between application of the

- 56 -

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

1   statute and the exercise of First Amendment freedoms.

2           In sum, McNeil will show at trial that because the "context and nature"

3   of the Truth About Splenda website make clear that it is essentially commercial, not

4   political activity, counterclaim defendants' conduct should therefore be judged by

5   the standards of the Lanham Act. *Noerr* immunity should not be applied.

6                   **b.     Even If *Noerr* Were Applicable, the Sham**

7                           **Exception Precludes Counterclaim Defendants**

8                           **From Escaping Liability**

9           Even if the counterclaim defendants' activity was essentially political,

10   they are not entitled to the protection of the *Noerr-Pennington* doctrine if their

11   petitioning activity was a sham. As the Ninth Circuit has held, "neither the Petition

12   Clause nor the *Noerr-Pennington* doctrine protects sham petitions, and statutes

13   need not be construed to permit them." *Sosa*, 437 F.3d at 932. "A 'sham' situation

14   involves a defendant whose activities are not genuinely aimed at procuring

15   favorable government action at all." *Kottle v. Northwest Kidney Centers*, 146 F.3d

16   1056, 1060 (9th Cir. 1998).

17           To determine whether the Truth About Splenda campaign is a sham,

18   the campaign must be evaluated on both a subjective and objective basis. *Theofel v.*

19   *Farey-Jones*, 359 F.3d 1066, 1079 & n.6 (9th Cir. 2004). The "subjective" prong

20   involves an assessment whether the counterclaim defendants' conduct is "merely an

21   attempt to stifle competition" – *i.e.*, "a concealed attempt to interfere with

22   [McNeil's] business relationships." *Kottle*, 146 F.3d at 1060, 1063. The

23   "objective" prong requires a determination whether the hypothetical FDA

24   "petitions" that the counterclaim defendants urge individual consumers to file

25   would lack merit. The fundamental question is whether the counterclaim

26   defendants are "us[ing] the governmental process – as opposed to the outcome of

27   that process – as an anticompetitive weapon." *Id.* at 1060.

28           Through the evidence described above, McNeil will show at trial that

- 57 -

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
CV 04-10077 DSF (RZX)

1  counterclaim defendants' subjective intent was primarily to stifle competition, *i.e.*

2  to convert Splenda users to sugar users.  And McNeil will show that the petitioning

3  activity to which the Truth About Splenda website relates – specifically, the site's

4  invitation to consumers to "send a letter to the FDA" – is objectively baseless in the

5  sense that no "objective [person] could conclude that the [letters] were reasonably

6  calculated to elicit a favorable outcome."  *Professional Real Estate Investors v.*

7  *Columbia Pictures Indus.*, 508 U.S. 49, 60 (1993); *see* (Opinion at 13)

8          **c.       The Website Is Not "Attendant Publicity" for**

9                    **this Lawsuit**

10  Counterclaim defendants have argued that the Truth About Splenda

11  website should be immunized from scrutiny because it is "inextricably linked to the

12  litigation."  The Court has already properly rejected this argument.  See December

13  6, 2007 opinion at 6 n.5 ("Counterclaim Defendants also argue that, even if the

14  TAS website were objectively baseless, the sham exception would not apply

15  because the TAS website is inextricably connected with this litigation.  The Court

16  disagrees.  Counterclaim Defendants' passing references to the existence of this

17  litigation are not sufficient to immunize all of the statements on the TAS website

18  under the *Noerr-Pennington* doctrine.").

19          **5.       Damages**

20                  **a.       Disgorgement**

21  While injunctive relief is "the remedy of choice" under the Lanham

22  Act, the statute also permits awards of money damages in certain circumstances.

23  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988); *see*

24  *also* 15 U.S.C. § 1117(a).  Specifically, Section 35(a) provides that a plaintiff shall

25  be entitled, "subject to the principles of equity, to recover (1) defendant's profits,

26  (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15

27  U.S.C. § 1117(a).  The statute makes clear, however, that any damages "shall

28  constitute compensation and not a penalty" and that the court "may in its discretion

- 58 -

1   enter judgment for such sum as the court shall find to be just, according to the

2   circumstances of the case." *Id.*  In all events, "a [p]laintiff is not . . . entitled to a

3   windfall." *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1405 (9th Cir. 1993)

4   (internal quotation omitted).

5              Within the universe of possible monetary awards, disgorgement of a

6   competitor's profits – also known as an "accounting for profits" – is the most

7   extreme and is rarely awarded. *See U-Haul Int'l., Inc. v. Jartran, Inc.*, 793 F.2d

8   1034, 1039 (9th Cir. 1986) (describing disgorgement as an "extraordinary"

9   remedy); *see also Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 770 (2d Cir.

10  1984).  Plaintiffs will adduce no facts at trial entitling them to disgorgement of

11  McNeil's profits.

12             **An accounting for profits would unlawfully penalize McNeil and**

13  **provide plaintiffs with a windfall:**  Where the plaintiff and defendant are direct

14  competitors, the Ninth Circuit permits courts to order disgorgement "as a surrogate

15  measure of damages" if an injury has plainly occurred, but quantifying that injury is

16  impossible. *See Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117

17  (9th Cir. 1968); *Playboy Enter., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1274

18  (9th Cir. 1982).  In such cases, the defendant's profits will roughly approximate the

19  plaintiff's injury and disgorgement may serve as a proxy for proof of actual

20  damages. *See Lindy Pen*, 982 F.2d at 1407.  The evidence will show that plaintiffs

21  not only *can* calculate their damages with precision, but that their expert economist

22  *has in fact done so*.  While plaintiffs may advance a spurious argument that price

23  erosion has afflicted the sugar industry because of McNeil's advertising (making

24  their damages difficult to quantify), their expert has already disavowed that theory.

25             Accordingly, if plaintiffs are entitled to monetary relief at all, it can

26  only be in an amount equal to their actual damages.  Disgorgement of McNeil's

27  profits – which would compensate plaintiffs at anywhere between 6 and 26 times

28  the lost profits they have alleged – would clearly violate the statutory prohibition

- 59 -

1   against punitive damages and give plaintiffs an improper windfall. *Id.* at 1405; 15

2   U.S.C. § 1117; *see also Burndy*, 584 F. Supp. 656, 667 (D. Conn. 1984), aff'd, 748

3   F.2d 767 (2d Cir. 1984).

4          The Ninth Circuit has expressed skepticism about awarding

5   disgorgement in false advertising cases where the challenged claims are "about

6   [defendant's] own product, when advertising does not directly compare defendant's

7   and plaintiff's products, when numerous competitors participate in a market, or

8   when the products are aimed at different market segments." *Harper House, Inc. v.*

9   *Thomas Nelson, Inc.,* 889 F.2d 197, 209 n.8 (9th Cir. 1989).  In such scenarios,

10   "injury to a particular competitor may be a small fraction of the defendant's sales,

11   profits, or advertising expenses . . . and large, presumptive damage awards are

12   improper in a situation where injury is likely to be slight." *Id.*

13          The claims at issue in this case – that Splenda is "made from sugar,"

14   "tastes like sugar" and "made from sugar so it tastes like sugar" – describe

15   McNeil's own product and do not imply that Splenda is superior to sugar in any

16   way.  Plaintiffs do not own the word "sugar," which is a commodity and not a

17   brand, and cannot claim that McNeil's advertising targets any of their individual

18   products.  In other words, the challenged advertising is non-comparative.  Further,

19   McNeil will establish at trial that using the word "sugar" as a reference point to

20   describe a product's taste is industry practice in the low calorie sweetener category.

21          The evidence will show that on these facts, no one party (or

22   consortium of parties) can claim to have suffered all of the alleged injury resulting

23   from McNeil's advertising; indeed, McNeil has already defended multiple claims as

24   a result of its advertising.  The law is clear that disgorgement would be wholly

25   improper in this scenario. *See Harper House, Inc.,* 889 F.2d at 209 n.8; *see also*

26   *Burndy*, 584 F. Supp. at 668 (holding disgorgement improper because "[i]f one

27   competitor, in a false advertising case, is permitted to receive the wrong-doer's

28   profits, there is no preclusion to another competitor seeking the same redress").

- 60 -

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
CV 04-10077 DSF (RZX)

1   **Disgorgement would be inequitable on the facts of this case:** The
2   Ninth Circuit has noted that "[e]quity has many reeds. A characteristic of it is that
3   one may not get all of the reeds. One may get just enough relief to stop the evil
4   where it is apparent no great damage was done to the complainant." *Highway*
5   *Cruisers of Cal., Inc. v. Security Indus., Inc.*, 374 F.2d 875, 876 (9th Cir. 1967).

6   McNeil has incurred significant costs defending and resolving several
7   false advertising litigations, and has already made changes in its advertising that
8   address many of plaintiffs' concerns. Added to any amount that may be paid to
9   plaintiffs as compensatory damages, these costs and agreements are more than
10  sufficient to fulfill the Lanham Act's deterrence policy. An order requiring McNeil
11  to disgorge its profits in addition would be inequitable. *See Faberge, Inc. v. Saxony*
12  *Prods., Inc.*, 605 F.2d 426, 429 n.1 (9th Cir. 1979) (because litigation costs and
13  packaging changes were sufficient to deter defendant from future infringement, an
14  accounting for profits was unwarranted).

15  **Plaintiffs cannot recover McNeil's profits for the entire sugar**
16  **industry or other competitors of McNeil:** While plaintiffs seek to recover all of
17  McNeil's "ill-gotten gains," the only legally-cognizable basis for an award of
18  disgorgement would be to compensate *these plaintiffs* for an injury that they
19  allegedly suffered but cannot quantify. Plaintiffs have no legal entitlement to
20  McNeil's profits that, by their own admission, would otherwise have gone to Equal,
21  Sweet'N Low, or other sugar producers (domestic or foreign). *See Playboy Enter.*,
22  692 F.2d at 1274.

23  **b.    Corrective Advertising**

24  As a form of compensatory damages, an award for corrective
25  advertising "is intended to make the plaintiff whole . . . by allowing [it] to recover
26  the cost of advertising undertaken to restore the value [its] trademark has lost due to
27  defendant's infringement." *Adray v. Adray-Mart, Inc.*, 76 F.3d 984, 988 (9th Cir.
28  1995). The facts adduced at trial will demonstrate that plaintiffs have suffered no

- 61 -

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
CV 04-10077 DSF (RZX)

1   injury entitling them to corrective advertising damages, let alone an award that

2   vastly exceeds their alleged lost profits.

3        **Plaintiffs must demonstrate reputational harm:**  The Ninth Circuit

4   has recognized two forms of corrective advertising damages:  retrospective

5   damages to compensate a party for advertising undertaken before trial, *U-Haul Int'l*

6   *v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986), and prospective damages to

7   cover the costs of future corrective advertising.  *Adray*, 76 F.3d at 988; *see also*

8   *Cher v. Forum Int'l., Ltd.*, 213 U.S.P.Q. 96, 103 (C.D. Cal. 1982).  Damages for

9   prospective corrective advertising are available, however, only where the plaintiff

10   can establish reputational harm and are limited to, at most, an amount roughly

11   equivalent to its actual damages.  *Adray*, 76 F.3d at 988; *see also First Act Inc. v.*

12   *Brook Mays Music Co.*, 429 F. Supp. 2d 429, 438 (D. Mass. 2006).

13        While plaintiffs allege that their "Truth About Splenda" website is a

14   form of corrective advertising, they do not seek to recover the comparatively small

15   sums they have already spent on that campaign.  Rather, they seek prospective

16   damages for a corrective advertising campaign that is breathtaking in scope and

17   expense.[17]  Through its expert, Dr. Michael Mazis, McNeil will demonstrate at trial

18   that the proposed corrective advertising campaign would be wildly overbroad,

19   unprecedented, and unnecessary.  In addition, however, plaintiffs' request for

20   corrective advertising damages fails as a matter of law because they cannot

21   establish reputational harm.  The law is clear that "[a] damage award for

22   prospective remedial advertising may stand only if it compensates the injured party

23   for identifiable harm to its reputation."  *First Act Inc.*, 429 F. Supp. 2d  at 438;  *see*

24   *also PBM Prod., Inc. v. Mead Johnson & Co.*, 174 F. Supp. 2d 417, 420 (E.D.Va.

25   2001).

---

26   [17]  In comparison, McNeil has asserted a modest claim for corrective advertising based on

27   the sums it has spent to date correcting the false messages plaintiffs have disseminated about Splenda and projecting those amounts forward.  At trial, McNeil will show that such

28   an award is necessary to correct the reputational harm it has suffered as a result of plaintiffs' false advertising.

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
CV 04-10077 DSF (RZX)

1    Plaintiffs can adduce no facts that demonstrate that the challenged

2    advertising has injured the reputation of their companies or products in any way.

3    First, as noted above, McNeil's advertising only makes reference to "sugar," a

4    commodity and not a brand or trademark associated exclusively with plaintiffs.

5    Second, consistent with widespread industry practice among manufacturers of low

6    calorie sweeteners, McNeil uses the term "sugar" as a favorable reference point to

7    describe the origins and taste of Splenda.  It neither disparages nor tarnishes sugar

8    (let alone plaintiffs themselves).  Accordingly, plaintiffs are not entitled to

9    prospective corrective advertising damages.

10          **An award for prospective corrective advertising may not exceed**

11   **plaintiffs' actual damages:**  Even if plaintiffs were somehow able to establish

12   reputational harm, the Ninth Circuit has held that any award for the cost of a

13   prospective advertising campaign may not exceed the actual damages they suffered

14   because of McNeil's advertising. *See Adray*, 76 F.3d at 989 (the trial court "should

15   direct the jury to award such damages only to the extent that the amount of money

16   needed for corrective advertising does not exceed the damage to the value of

17   [plaintiff's] mark").  Because plaintiffs calculate their actual damages at between

18   $14 and $28 million, an award for corrective advertising cannot exceed that

19   amount.  Anything greater would "present a danger of overcompensation." *Id.*

20   (citing *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992)).

21          **Corrective advertising damages must not penalize McNeil or give**

22   **plaintiffs a windfall:**  As noted above, any award of damages under the Lanham

23   Act must "constitute compensation and not a penalty," 15 U.S.C. § 1117(a), and

24   plaintiffs are not "entitled to a windfall." *Lindy Pen*, 982 F.2d at 1405.  Corrective

25   advertising is no exception.  Any award for such damages must be compensatory in

26   nature and bear a reasonable relationship to plaintiffs' actual losses.  Accordingly,

27   plaintiffs are not entitled to the bloated corrective advertising award they now seek.

28

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

## V.   EVIDENTIARY ISSUES

McNeil has filed the following fourteen motions *in limine* addressing anticipated evidentiary issues at trial:

1.   to exclude evidence and testimony concerning other litigation concerning Splenda advertising (Motion in limine No. 1);

2.   to preclude improper references to defense counsel (Motion in limine No. 2);

3.   to exclude evidence or testimony concerning (a) foreign judgments about advertising for Splenda and (b) the marketing and sale of Splenda in jurisdictions outside of the United States (Motion in limine No. 3);

4.   to preclude plaintiffs and their experts from referencing the opinions, reports, and surveys of experts who testified on behalf of the Merisant Company in Merisant Co. v. McNeil Nutritionals LLC (04-cv-5504) (Motion in limine No. 4);

5.   to exclude evidence and testimony of third party statements regarding Splenda advertising (Motion in limine No. 5);

6.   to exclude evidence and testimony of anecdotal confusion allegedly caused by Splenda advertising (Motion in limine No. 6);

7.   to exclude a survey conducted by non-party Center for Science in the Public Interest (Motion in limine No. 7);

8.   to preclude testimony or argument concerning alleged sugar price erosion (Motion in limine No. 8);

9.   to exclude evidence that Splenda, as opposed to sucralose, has not been tested (Motion in limine No. 9);

10.   to exclude inflammatory and irrelevant evidence and testimony concerning the proprietary manufacturing process for sucralose (Motion in limine No. 10);

1   11.   to exclude the duplicative testimony of Drs. Mohamed B. Abou-
2         Donia and Susan S. Schiffman concerning plaintiffs' rat study
3         (Motion in limine No. 11);

4   12.   to exclude evidence and testimony concerning adverse event reports
5         and anecdotal consumer complaints about Splenda (Motion in limine
6         No. 12);

7   13.   to exclude evidence and testimony concerning drugs approved by
8         FDA which later had their approval withdrawn or were recalled
9         (Motion in limine No. 13);

10  14.   to exclude the proposed trial testimony of Michael Jacobson, Patrick
11        Henneberry, and H.P. Mechler (Motion in limine No. 14).

## VI.   ABANDONMENT OF ISSUES

McNeil does not intend to pursue the affirmative defenses of no real party in interest, nonjoinder of parties, waiver, estoppel, statute of limitations and First Amendment. With respect to the defense of failure to state a claim, McNeil considers that defense moot. Similarly with respect to the defense of standing, while McNeil currently considers the issue to be moot, McNeil reserves all of its rights to re-assert the defense if appropriate. Finally, McNeil does not consider the next four issues to be separate affirmative defenses that it will assert at trial, but it reserves its rights to introduce evidence at trial on each one: no entitlement to relief, no damages, no causation, and failure to mitigate damages.

## VII.   ATTORNEYS' FEES

McNeil is seeking its attorneys' fees pursuant to 15 U.S.C. § 1117, which authorizes the award of attorneys' fees in exceptional cases, and pursuant to the Court's authority to award attorneys' fees on McNeil's counterclaims under California Business & Professions Code §§ 17200 and 17500. *See Californians for Population Stabilization v. Hewlett-Packard Co.*, 58 Cal. App. 4th 273, 296 (Cal. App. 6 Dist. 1997); *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1407 (Cal. App.

MCNEIL MEMO OF FACT AND LAW
[CORRECTED VERSION]
CV 04-10077 DSF (RZX)

4 Dist. 1991).

## VIII.  BIFURCATION

McNeil does not request that any issues be bifurcated for purposes of trial.


Dated:        January 9, 2008

RICHARD B. GOETZ
DIANA M. TORRES
CARLOS M. LAZATIN
O'MELVENY & MYERS LLP

STEVEN A. ZALESIN
CLAY J. PIERCE
KARLA G. SANCHEZ
PATTERSON BELKNAP WEBB &
TYLER LLP


By:/s/ Karla G. Sanchez
        Karla G. Sanchez

*Attorneys for Defendants McNeil-PPC, Inc.
and McNeil Nutritionals, LLC*

**MCNEIL MEMO OF FACT AND LAW**
**[CORRECTED VERSION]**
CV 04-10077 DSF (RZX)